Filed:  July 15, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 96-4212
(CR-95-169)

United States of America,

Plaintiff - Appellee,

versus

Juvenile Male #1,

Defendant - Appellant.

O R D E R

The Court amends its opinion filed June 11, 1996, as follows:

On page 2, second full paragraph, line 10 -- a section symbol is added before "922(x)."

On page 2, third full paragraph, line 3 -- the phrase "an Asheville parking lot" is corrected to read "a Charlotte parking lot."

For the Court - By Direction

/s/ Bert M. Montague

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 96-4212

JUVENILE MALE #1,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, Chief District Judge.
(CR-95-169)

Argued: May 6, 1996

Decided: June 11, 1996

Before WILKINSON, Chief Judge, and HALL and MICHAEL,
Circuit Judges.

_____

Affirmed and remanded by published opinion. Judge Hall wrote the
majority opinion, in which Judge Michael joined. Chief Judge Wil-
kinson wrote an opinion concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Charles Linwood Morgan, Jr., Charlotte, North Carolina,
for Appellant. Kenneth Davis Bell, First Assistant United States
Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:**
Mark T. Calloway, United States Attorney, Charlotte, North Caro-
lina, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

Juvenile #1,**1** who was initially charged in federal court with committing acts of juvenile delinquency, appeals the order transferring his case to adult status. We affirm and remand for further proceedings.

I

On September 18, 1995, Juvenile #1 was charged in a juvenile information with the following acts of delinquency: unlawfully taking by violence a motor vehicle shipped in interstate commerce (carjacking), in violation of 18 U.S.C. § 2119, and conspiring to violate the carjacking statute, in violation of 18 U.S.C. § 371; carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1), and conspiracy to violate the same statute; causing the death of a person through the use of a firearm, in violation of 18 U.S.C. §§ 924(i) and 2; possession of a handgun by a person under the age of eighteen, a misdemeanor, in violation of 18 U.S.C. § 922(x); and hindering the apprehension of an offender, in violation of 18 U.S.C. § 3. On the same date, the government certified to the court that six of the seven counts involved crimes of violence and that "there exists as to all counts a substantial federal interest warranting the exercise of federal jurisdiction pursuant to 18 U.S.C. § 5032." The government also moved for the transfer of Juvenile #1 to the appropriate district court for prosecution as an adult.

The following story emerged at the transfer hearing. On June 11, 1995, Juvenile #1 and a twenty-one year old, Darius Bennett, stole a car from a Charlotte parking lot. At the time, Juvenile #1 had a .380 handgun and Bennett had a 12-gauge pistol grip shotgun. They then met two other juveniles and another adult, and the five discussed robbing someone. The group drove in the stolen car to the Hilton hotel and waited in the parking lot. As a car drove in and parked, Juvenile #1 remarked, "There go two white women, let's jack [rob] them."

_____

**1** 18 U.S.C. § 5038(e) provides that "[u]nless a juvenile . . . is prosecuted as an adult neither the name nor picture of any juvenile shall be made public in connection with a juvenile delinquency proceeding."

2

Juvenile #1 and Bennett, each with his gun, approached the women's car. Juvenile #1 went to the driver's side and told the driver, Alisa Reasor, to give him the keys; she complied. As Bennett approached the passenger side, Patricia Jones started to run, and Bennett shot her in the back at close range and killed her. Reasor escaped and hid while the two stolen cars pulled away. Juvenile #1 drove the women's car.

The women's car was found abandoned seven miles out of town. Phone calls had been made from the women's cellular phone; one call was to Juvenile #1's hometown in Massachusetts. The group went to a cookout at a friend's house that evening, and two empty bottles of the souvenir wine that the women had bought that day were found in a nearby dumpster. Juvenile #1 took a cab home that night. The cabby gave a statement that Juvenile #1 said that he and his friend had stolen a car and that his friend "got stupid and shot at a woman."

The district court ordered that Juvenile #1 be transferred to adult status.[2] In this appeal, he contends that his case should not be in federal court at all, and, even if it should, that he should not be prosecuted as an adult. We turn first to the issue of the court's subject matter jurisdiction.

II

The violation of a federal criminal law by a person under the age of eighteen is deemed an act of juvenile delinquency. 18 U.S.C. § 5031. There are, however, restrictions on the exercise of federal jurisdiction over juveniles. A juvenile accused of delinquency shall not be proceeded against in federal court

> unless the Attorney General, after investigation, certifies to the appropriate district court that . . . (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the

_____

[2] The other two juveniles were similarly charged and transferred, but only Juvenile #1 has taken an interlocutory appeal from the transfer order.

3

> State does not have available programs and services ade-
> quate for the needs of juveniles, or (3) the offense charged
> is a crime of violence that is a felony or [one of a number
> of a specified drug or firearm offenses], and that there is a
> substantial Federal interest in the case or the offense to war-
> rant the exercise of federal jurisdiction.

18 U.S.C. § 5032. In the certification submitted in Juvenile #1's case, the stated basis was the third prong, "a crime of violence . . . and a substantial Federal interest." No further reasons were given, either in the certification document or at the transfer hearing, for the government's[3] decision to proceed in federal court rather than permitting the state authorities to handle the matter.

Juvenile #1 moved to dismiss the case on the ground that the Attorney General had failed to show a "substantial Federal interest" that would justify the exercise of federal jurisdiction. The government countered that the statute only required that the certification state that the case met one of the statutory criteria, which it did. The district court ruled that the form of the certification was indeed proper, and, further, that the basis of the government's decision-- the nature of the "substantial Federal interest" -- was not a reviewable matter. On appeal, the threshold questions are these: Is the government's decision to proceed in federal court reviewable by the court, and, if so, to what extent?

A

The Attorney General clearly has the authority to initiate federal charges of juvenile delinquency. The issue is whether this prosecutorial discretion, once exercised, imbues the court with jurisdiction to proceed without further inquiry into whether the case actually meets the statutory criteria.[4]

_____

[3] Under the authorization found in 28 C.F.R. § 0.57, the Attorney General has delegated her certification and transfer authority to the United States Attorneys.

[4] It is important to keep in mind that this issue is distinct from the other issue before us, whether the appellant should be tried as an adult. See S.

4

The reviewability of the Attorney General's certification decision has generated a circuit split.**5** One court of appeals has held that the courts have the authority to review more than the mere form of the government's certification. In <u>United States v. Juvenile Male</u>, 923 F.2d 614 (8th Cir. 1991), the appeals court considered whether the offenses charged -- travel in interstate commerce with intent to murder and conspiracy to murder -- were "crimes of violence" within the meaning of § 5032(3). After deciding that they were, the court moved on to the form of the certification and found it lacking because it failed to state that there was a substantial federal interest in the case. <u>Id.</u> at 620. This technical requirement was deemed a "jurisdictional prerequisite," albeit one that could be readily remedied by retyping the certification document. <u>Id.</u> No mention was made of reviewing the basis for finding a "substantial Federal interest," but the implication is that merely reciting the statutory language would be sufficient. <u>See id.</u> at 617-18 ("While this court may not have the power to guide a federal prosecutor's discretion, we must insure that the exercise of that discretion is within the confines of section 5032."). <u>See also</u> <u>United States v. Doe</u>, 49 F.3d 859, 866-67 (2nd Cir. 1995) (reviewing district court's finding that the offense charged was a "crime of violence" within § 5032's certification provisions).

---

Rep. No. 225, 98th Cong., 2d Sess. 389 n.10, <u>reprinted in</u> 1984 U.S.C.A.N. 3182, 3529 (hereinafter "S. Rep.") ("The criteria for prosecution of a juvenile as an adult are entirely separate from the criteria which governs whether a juvenile must be surrendered to State authorities. Only if the criteria for retaining federal jurisdiction over a juvenile in the first instance . . . are met, may there then be consideration of whether Federal prosecution, as opposed to a Federal juvenile delinquency proceeding, is appropriate.").

**5** In <u>United States v. Romulus</u>, 949 F.2d 713, 715 (4th Cir. 1991), <u>cert. denied</u>, 503 U.S. 992 (1992), we noted in our rendition of the facts of that case that "[t]he Attorney General made the necessary certification to the district court as required by 18 U.S.C.A. § 5032, providing the district court with jurisdiction over Romulus." The opinion, however, does not mention whether Romulus raised an issue regarding the jurisdictional sufficiency of the certification, and, to the extent that our opinion can be read to support the view that certification is not reviewable, it is dictum. The government does not rely on <u>Romulus</u> to support its position on the certification issue in the instant case.

The Second and Eleventh Circuits, on the other hand, have held that the district court may not look behind the certification decision except where there are allegations of prosecutorial bad faith. See United States v. C.G., 736 F.2d 1474 (11th Cir. 1984); United States v. Vancier, 515 F.2d 1378 (2nd Cir.), cert. denied, 423 U.S. 857 (1975). In Vancier, the court pointed to the lack of any specific statutory provision for judicial review and the lack of standards under which such review should be conducted. Id. at 1380. The certification also was viewed as belonging to a category of unreviewable prosecutorial decisions, such as a determination that the public interest requires that a witness be compelled to testify under immunity. Id. at 1381.**6** Under this view, the certification requirement "qualifies the Government's discretion, . . . but it does not grant the power to the courts to make the final decision." Id. at 1380-81.

B

One district court in our circuit has concluded, based on the Eighth Circuit's decision in Juvenile Male, that the "substantial Federal interest" element of the certification is reviewable. United States v. Male Juvenile, 844 F. Supp. 280 (E.D. Va. 1994).**7** Confronted with an obvious crime of violence -- armed bank robbery -- the court pointed to a Senate report on the 1984 amendments in which the committee noted that a "substantial Federal interest" should only be found in cases that

> give rise to special Federal concerns. Examples of such
> cases could include an assault on, or assassination of, a Fed-
> eral official, an aircraft hijacking, a kidnapping where state

_____

**6** Both C.G. and Vancier were decided before the 1984 amendments that added subsection (3)'s "substantial Federal interest" prong. See Pub. L. No. 98-473, § 1201(a), 98 Stat. 2149 (1984). The certification in each of these cases was based on an alleged lack of state court jurisdiction over the juvenile with respect to the offenses charged. C.G., 736 F.2d at 1477; Vancier, 515 F.2d at 1380.

**7** Contra United States v. Juvenile Male, 915 F. Supp. 789, 793 (W.D. Va. 1995) (hereinafter "Juvenile Male (W.D. Va.)") (holding that "the court may only make a facial inquiry into the validity of the certification.").

boundaries are crossed, a major espionage or sabotage offense, participation in large-scale drug trafficking, or significant or willful destruction of property belonging to the United States.

Id. at 283 (quoting S. Rep. at 389). The court concluded that the certification requirement was intended to limit federal jurisdiction over juveniles to something less than all violent federal offenses; otherwise, "the `substantial Federal interest' language would be reduced to mere surplusage." Id. at 284. The court then ruled that "the Government's interest in an ordinary bank robbery, absent some allegation of a special Federal concern, per se does not rise to the level of a substantial Federal interest" (emphasis in original), and, therefore, compliance with § 5032 had not been shown. Id. at 285. The case was dismissed for lack of jurisdiction.

That there is a clear congressional intent to limit the types of cases that the executive should bring in federal court does not necessarily implicate a concomitant judicial power to look behind such decision. Nevertheless, although neither Juvenile Male nor Male Juvenile provides a completely satisfactory rationale, we are of the opinion that the "substantial interest" and other prongs of the certification statute act as limits on the federal courts' jurisdiction to act in this sphere.

C

It should be beyond serious argument that the courts should review compliance with the essentially technical requirements of § 5032, such as the proper certifying party (United States v. Cuomo, 525 F.2d 1285, 1287 (5th Cir. 1976)), timeliness of the certification (id. at 1289; United States v. Baker, 10 F.3d 1374, 1396 (9th Cir. 1993), cert. denied, 115 S. Ct. 330 (1994)), inclusion of the statutory language (Juvenile Male), or the age of the juvenile. The issue of reviewability is a closer one when certification is based on a judgment call by the prosecutor such as, for instance, that the state lacks "adequate" services and programs, or on the assertion of legal "facts" and conclusions such as the lack of state court jurisdiction (Vancier, C.G.) or that the charge involves a "crime of violence" (Male Juvenile). Whether there is a "substantial Federal interest," however, comes closer to the sort of discretionary decision more commonly thought

7

of as the type of prosecutorial decisions that are immune from judicial review. See Vancier, 515 F.2d at 1381 (noting "several instances in which it has been held that members of the executive branch are authorized to make certain unreviewable determinations in connection with law enforcement matters"). The Attorney General's decision in this regard is perhaps entitled to more deference than a determination that a given offense is a "crime of violence." Nevertheless, we believe that the intent of Congress was that a court must first satisfy itself that there is indeed a substantial interest before jurisdiction can be assumed over the juvenile.

D

The lack of a specific provision addressing judicial review is in and of itself no bar to review. In Gutierrez de Martinez v. Lamagno, 115 S. Ct. 2227 (1995), the Court analyzed a similar question of "who decides" in the context of the scope-of-employment certification under the Westfall Act. Because the text of the statute was ambiguous, the Court "adopt[ed] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review and that mechanical judgments are not the kind federal courts are set up to render." Id. at 2236. The Court found nothing in the language of the statute or in the legislative history to indicate that the scope-of-employment decision was intended to be unreviewable. The Court also noted two considerations that militated in favor of finding that the decision was reviewable. First, there is often a financial incentive present in the scope-of-employment decision, and second, the certification decision itself is dispositive of the controversy. Id. at 2227.

The structure of § 5032 is similar to the provisions of the Westfall Act analyzed in Lamagno: "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment, . . . the United States shall be substituted as a party defendant." 28 U.S.C. § 2679(d)(1). To be sure, the decision to proceed against a juvenile in federal court does not entail the financial considerations present in a Westfall Act case, nor is a § 5032 certification dispositive of the merits of the controversy. See Juvenile Male (W.D. Va), 915 F. Supp. at 794-95. However, other perhaps weightier considerations of a different sort militate against finding that "the

8

strong presumption that Congress intends judicial review" has been overcome in the juvenile justice arena. <u>Lamagno</u>, 115 S. Ct. at 2231 (quoting <u>Bowen v. Michigan Academy of Family Physicians</u>, 476 U.S. 667, 670 (1986)).

E

Prior to the 1984 amendments, § 5032 embodied a clear preference for having juvenile criminal matters handled in the state courts. Then as now, subsection (1) provided for federal jurisdiction if the state was unable or unwilling to do anything, while subsection (2) allowed the federal court to get involved if the state was unequipped to offer "programs and services adequate for the needs" of the juvenile. Executive discretion was limited to three questions: Can the State handle it? Will the State handle it? Is the State a better place to handle it (from the juvenile's perspective)? Prior to the 1984 amendments, then, the certification statute embodied an almost purely rehabilitative model in which the federal court would only become involved when necessary for the good of the juvenile. <u>See United States v. Hill</u>, 538 F.2d 1072, 1074 (4th Cir. 1976) (the purpose of the juvenile statute "is to be helpful and rehabilitative rather than punitive").

The 1984 amendments, however, injected a new element into the certification calculus: Is the crime of a sufficiently serious type that federal resources should be called upon, without regard to the State's willingness or ability to handle the matter? The addition of this third prong, with its focus on the offense rather than the offender, vastly expanded the possible bases for invoking federal jurisdiction.

In addition, in 1984 and again in 1988, Congress expanded the circumstances under which transfer to adult status is possible and, in some cases, mandatory. <u>See</u> Pub. L. No. 98-473, § 1201(b)(1)-(3), 98 Stat. 2149 (1984); Pub. L. No. 100-690, § 6467(a), 102 Stat. 4375 (1988). Prior to the 1984 amendments, there were no provisions for mandatory transfer, and juveniles who committed offenses when they were younger than sixteen could not be tried as adults regardless of the crime. The import of this expansion, both in federal jurisdiction and federal adult jurisdiction, is obvious -- juvenile crime is becoming, particularly by virtue of the increase in the overall number of

9

serious crimes committed by juveniles, a national problem that Congress believes is best addressed on a federal level.**8**

Against this legislative backdrop, we return to the original question: Who decides? We find nothing in the statutory language or legislative history that would overcome the presumption of judicial review. See id. at 2231 ("[W]e have stated time and again that judicial review of executive action `will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" (quoting Abbot Laboratories v. Garner, 387 U.S. 136, 140 (1967)). Except for that limited group of crimes to which mandatory transfer to adult status applies, the focus of the juvenile statutes is still on rehabilitation within the state systems.**9** Therefore, we continue to adhere to our long held view that rehabilitation is the primary focus of the juvenile justice system, and that focus should be given important consideration in construing the juvenile statutes. See In re Gault, 387 U.S. 1, 14-18 (1967) (tracing history of juvenile justice system).

In the final analysis, whether there is a "substantial Federal interest" in a given case implicates our authority over the juvenile to the same extent and for many of the same reasons as whether the juvenile is alleged to have violated a federal law, whether that violation is a "crime of violence," or whether the appropriate state authorities have refused to act. In short, we can and must first satisfy ourselves that our jurisdiction has been properly invoked. We do so by reviewing the stated reasons underlying the government's decision to proceed in federal court. See United States v. Doe, 13 F.3d 302, 304 n.1 (9th Cir. 1993) ("The government must show a substantial federal interest only when it certifies a serious federal crime.") (dicta).

_____

**8** See S. Rep. at 386 ("[C]ertain modifications in current law are necessary to allow an adequate Federal response to serious criminal conduct on the part of juveniles").

**9** See S. Rep. at 386 ("The essential concepts of the [Juvenile Justice and Delinquency Act of 1974] are that juvenile delinquency matters should generally handled by the States and that criminal prosecution of juvenile offenders should be reserved for only those cases involving particularly serious conduct by older juveniles. The Committee continues to endorse these concepts . . .").

10

III

If the certification decision is reviewable, as we hold it is, must we now remand this case in order to allow the district court to conduct that review in the first instance? Despite the lack of a record explaining the Attorney General's decision to bring this action in the district court, we are of the opinion that a substantial federal interest is clearly present.

Juvenile #1 attempts to minimize the federal interests by characterizing the sole basis for federal jurisdiction as being the involvement of a car that was manufactured outside the borders of North Carolina (which is to say, the involvement of a car). There is, of course, also the use of a firearm. More significantly, there is the carjacking itself, a crime that until recently was, with exceptions, the sole province of the states. Our review of the legislative history of the carjacking statute convinces us that the federal interest here is significant enough to reach the "substantial interest" threshold of § 5032.

In response to the growing use of violence to steal cars, Congress federalized the crime of carjacking in 1992. Pub. L. No. 102-519, § 101(a), 106 Stat. 3384 (1992) (codified at 18 U.S.C. § 2119). The level of Congressional concern is revealed in the harshness of the punishments prescribed: Imprisonment of up to fifteen years for carjackings in which no one was injured, and the death penalty for those carjackings that result in death of a victim. Floor debates and committee reports all attest to the Congress's concern with both the increasing number of carjackings as well as the increasingly violent nature of the crimes.[10] The role of juveniles was noted:

> [A]nother aspect of the auto theft problem is the rash of theft by juveniles. Children, some not even teenagers, are stealing cars at an appalling rate. They start young-- sometimes they're barely tall enough to see over the steering wheel. Unfortunately, it doesn't take long for them to become experts, able to enter and steal a car in seconds. These young auto thieves pose a substantial threat to public safety.

---

[10] See, e.g., 138 Cong. Rec. S17,960 (1992) (remarks of Sen. Pressler).

11

138 Cong. Rec. S17,961 (1992) (remarks of Sen. Lautenberg). The penalties and the sense of urgency engendered by the national "epidemic of motor vehicle theft" and the "plague" of carjacking are strong indicators of more than a run of the mill federal interest in the problem.**11**

Juvenile #1 is charged with six federal felonies. That the circumstances of the carjacking and murder are particularly egregious militates strongly in favor of the exercise of federal jurisdiction. We hold that there is a sufficient "substantially Federal interest" for the invocation of federal jurisdiction over this case. We turn, then, to the transfer itself.

IV

A

Section 5032 provides that a juvenile may be transferred to adult status "if [the district] court finds, after hearing, such transfer would be in the interests of justice." The statute also requires the court to consider six factors. These factors, and the district court's findings with regard to each, are as follows:

(1) Age and social background: The district court recognized that Juvenile #1 was neglected and abused throughout much of his life. However, the court noted that he was fifteen at the time of the offense and therefore old enough to know the serious nature of his actions. The court also noted that under state law (N.C.G.S. § 7A-608 (1994 Supp.)), a juvenile thirteen years or older who commits the same crime is "automatically transferred" to adult status. "On balance, Juvenile #1's age and background weigh in favor of transferring him . . ."

(2) Nature of alleged offense: The court found that Juvenile #1 actively participated in the carjacking that led to the murder, that he

_____

**11** "Carjacking threatens to spread rapidly around the nation, as criminals engage in copycat crimes. To prevent such a plague, we need to bring Federal resources to bear." 138 Cong. Rec. S17,961 (1992) (remarks of Sen. Lautenberg).

stole things from the car, and that he "even drank the stolen wine." The court found that "the nature of the offense factor militates heavily in favor of transfer . . ."

(3) Extent and nature of prior delinquency record: A Massachusetts detective testified about Juvenile #1's earlier troubles with the law. In August 1994, he was involved in a fracas over a basketball bet in which he used a baseball bat as a weapon. In running from his opponent, he ran across several cars and caused over $250 in damages. He was convicted as a juvenile and put on probation. He later was charged with injuring school property and violating the state graffiti law (the latter being a felony), for which there are outstanding warrants. The district court found that this factor "favors transfer";

(4) Present intellectual development and psychological maturity: Juvenile #1 had miserable grades in the 9th grade, both in Massachusetts and, from April, 1995, through the completion of the school year, in Charlotte. After his arrest, he was placed in the Gatling Center, a juvenile diagnostic center, where his grades improved dramatically to all As and Bs. He was determined to be of average intelligence and able to understand the nature of his acts. Psychological reports noted that he is easily influenced by his peers and lets emotion, especially anger, cloud his judgment. With regard to the carjacking incident, he didn't feel that he did anything wrong, that he did what he was told, and that he felt threatened; "I'm weak-minded." Dr. Custrini, a psychologist who evaluated Juvenile #1 under a referral from the juvenile's counsel, concluded that Juvenile #1 "may be able to gain some benefit from treatment at this time."

The court interpreted the psychological data as meaning that Juvenile #1 was able but not willing to take responsibility for his actions, and this factor was also found to favor transfer to adult status.

(5) Nature of past treatment efforts and the response to such efforts: Juvenile #1 had "received and benefitted from individual therapy" in Massachusetts from 1989 to May 1993, and he was in a youth group in Charlotte for the month preceding the murders. One of the teachers at Gatling reported that Juvenile #1 "continues to challenge verbally his peers, encourage his peers to violence, and incite others

13

not to do their classroom assignments." The court again found that, "on balance, this factor weighs in favor of transfer . . .";

(6) Availability of programs designed to treat the behavioral problems: The government put on some evidence of limited federal and state programs. A federal program in Tennessee could take Juvenile #1 until he turned 21, but the court felt that this was insufficient time to rehabilitate him.

Juvenile #1 does not object to any of the historical facts found by the district court. His argument is that the court wrongly interpreted these facts in finding that four of the six factors (#1, 3, 4 and 6) favored transfer.

B

The government has the burden of proving that a transfer "would be in the interests of justice." 18 U.S.C. § 5032. There is, however, no consensus among the courts of appeals on the burden of proof at the transfer hearing. It is settled that the district court is statutorily mandated to make findings on each of the enumerated factors. Romulus, 949 F.2d at 715. We have not yet articulated what specific burden of proof rests on the government, having held only that "[t]he question of whether the interest of justice is served by the transfer of a juvenile for adult prosecution is a decision within the broad discretion of the district court." Id.

Some courts have held that because the transfer proceeding is an adjudication of a status, rather than of a crime, it is civil in nature and, therefore, the government must "prove its case for transfer" by a preponderance of the evidence. United States v. Parker, 956 F.2d 169, 171 (8th Cir. 1992); see also United States v. A.R., 38 F.3d 699, 703 (3rd Cir. 1994) ("Although the government bears the burden of rebutting the statutory presumption of juvenile treatment, the government need only persuade the court by a preponderance of the evidence.") (citing Parker). We have held, in rejecting an argument that the Sixth Amendment requires trial by jury in delinquency adjudications, that the delinquency proceeding itself was not "essentially criminal" but was instead "an ascertainment of status as a juvenile delinquent." Hill, 538 F.2d at 1075.

14

We hold that the government must prove by a preponderance of the evidence that a transfer would be in the interests of justice. The district court, however, may determine what weight to give the various factors. United States v. Doe, 871 F.2d 1248, 1254-55 (5th Cir.), cert. denied, 493 U.S. 917 (1989). The "interest of justice" analysis requires the court to "balance the [rehabilitative] purposes against the need to protect the public from violent and dangerous individuals." United States v. Juvenile Male No. 1, 47 F.3d 68, 71 (2nd Cir. 1995) (citation omitted); see also United States v. T.F.F., 55 F.3d 1118, 1119 (6th Cir. 1995). Nothing in the record in this case indicates that the district court did not proceed properly in arriving at its ultimate conclusion that the government's transfer motion should be granted.**12**

C

We conclude that there was adequate evidence to support the court's findings on each factor. While Juvenile #1's family background is distressing, that North Carolina would automatically transfer him to adult status were this case in state court strongly militates in favor of a similar treatment. His juvenile record, while perhaps not extensive, is still a record, and it is one that was first established when he was more than two months shy of his fourteenth birthday.

Despite the record of some improvement during his recent detention at the federal diagnostic center, the court noted -- and Juvenile #1 does not dispute -- that he continues to "encourage his peers to violence." It is clear that the court did not err in concluding that Juvenile #1's "response to treatment," particularly in light of what was at stake while he was detained prior to the hearing, did not support repeated attempts at rehabilitation over the limited time available under the juvenile statutes.**13** See United States v. Nelson, 68 F.3d 583, 590 (2nd Cir. 1995) ("[A] glimmer of hope in future treatment, stand-

---

**12** In the "Memorandum and Order" transferring Juvenile #1, the district court expressly noted that the result would have been the same under either a clear-and-convincing or a preponderance standard.

**13** Under 18 U.S.C. § 5037(b), the maximum period of detention to which Juvenile #1 would have been subject had he been tried as a juvenile would be through "the date when he becomes twenty-one years old," which in this case is March 30, 2001.

15

ing alone, would be insufficient to warrant a finding that rehabilitation is likely.").

Finally, we are unable to find that the court erred in concluding that the sixth factor -- the availability of programs--also favored transfer. Local programs were deemed likely to exclude Juvenile #1 on the basis of the seriousness of the offense. The sole federal program about which evidence was presented could only keep Juvenile #1 until his twenty-first birthday, and we find no error in the court's finding that five years would be an insufficient period for an effective rehabilitation.

In the weighing of the various factors, the nature of the crime clearly predominates. The record of the transfer proceedings demonstrate that Juvenile #1 used his own gun in the carjacking. "[T]he seriousness of the crime obviously can be given more weight than other factors in determining whether there is a realistic chance of rehabilitation . . ." Doe, 871 F.2d at 1248. We find no errors in the court's conclusions,**14** and we further find no abuse of discretion in the court's ultimate decision that transfer would be in the interests of justice. Accordingly, we affirm the order transferring Juvenile #1 to adult status, and we remand for further proceedings.

AFFIRMED AND REMANDED

_____

**14** We note that there is a certain overlap between the factors underlying the certification decision by the executive and those informing the transfer decision by the court. In a case such as Juvenile #1's, much of the basis for the executive's decision to certify on the basis of "a crime of violence and a substantial federal interest" would also support a decision to seek a transfer.

Conversely, in those cases where the decision to proceed in federal court is based on the unavailability of adequate state programs and services to "meet the needs of the juvenile," § 5032(2), it would be incongruous in most cases for the executive to certify and then seek a transfer to adult status on the basis of a "substantial federal interest," when such transfer would have the effect of shifting the focus from the need to provide adequate treatment (the basis for being in federal court in the first place) to punishment as an adult.

16

WILKINSON, Chief Judge, concurring in the judgment:

While I agree with the result reached by the majority, I cannot subscribe to its reasoning. In my view, the government's certification "that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction," 18 U.S.C. § 5032, is not subject to judicial review. The "substantial Federal interest" inquiry is intended to channel prosecutorial discretion with respect to juvenile defendants, and is the sort of executive determination that should be immune from judicial oversight.

This conclusion follows directly from the language and structure of section 5032. The statute provides that there shall be no federal proceedings against a juvenile "unless the Attorney General, after investigation, certifies . . . that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." Id. Under a plain reading of this language, the only requirement is that the Attorney General attest to a "substantial Federal interest" in federal adjudication; the statute contains no provision allowing for judicial reassessment of the Attorney General's determination.

According to the majority, though, the "lack of a specific provision addressing judicial review is in and of itself no bar to review." While this may be true as a general matter, the absence of language authorizing judicial review is far more telling when, as is the case here, the same statute expressly provides for judicial review of another question. Section 5032 allows treating a juvenile as an adult upon "motion to transfer of the Attorney General," but only "if [the] court finds, after hearing, such transfer would be in the interest of justice." The statute thus explicitly requires judicial review of the Attorney General's motion for transfer, yet contains no provision for judicial review of the Attorney General's certification of a "substantial Federal interest." Presumably, the omission was deliberate, and verifies that Congress did not intend judicial review of certification. See Russello v. United States, 464 U.S. 16, 23 (1983) ("`Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)).

17

In addition, section 5032 contains no standards by which to judge a "substantial Federal interest." See United States v. Vancier, 515 F.2d 1378, 1380-81 (2d Cir.), cert. denied, 423 U.S. 857 (1975). The statute includes no definition of the term, and supplies no guidance as to the central considerations. Again, this lack of criteria is in stark contrast to the provision requiring judicial review of a motion for transfer to adult status: The statute enumerates six specific factors for courts to weigh in determining whether transfer of a juvenile would be "in the interest of justice,"[1] and prescribes that those factors "shall be considered" and that "findings with regard to each factor shall be made." 18 U.S.C. § 5032. Congress would have supplied comparable standards with respect to a "substantial Federal interest" if it envisioned judicial review of the Attorney General's certification.

Lacking such guidance, courts which venture to review the substantiality of the federal interest will adopt widely varying approaches. Some courts might use a "federal nexus" test and require that the charged offense involve federal property or a federal official. Others might ask whether the conduct in question is proscribed by federal law -- after all, anytime Congress enacts a criminal provision, there conceivably is a significant federal interest in enforcing it. Here, the majority has no difficulty finding a sufficient federal interest, based apparently on the enactment of stiff federal penalties for carjacking and on the existence of six federal felony charges. Such an inquiry, however, fails to provide meaningful standards for assessing the degree of federal interest. How many federal crimes, for instance, must a juvenile be charged with, and which federal offenses are sufficiently "substantial?"

The statute does not answer these questions. The only explanation of what suffices as a "substantial Federal interest in the case or the offense" is that it should "warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. This language is suggestive of an intent to

_____

[1] The factors are: "the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems." 18 U.S.C. § 5032.

18

guide prosecutorial discretion, see Vancier, 515 F.2d at 1380-81, as it alludes to the sort of case-specific policy determination that prosecutors must routinely make. United States v. W.P., Jr., 898 F. Supp. 845, 849-50 (M.D. Ala. 1995). For instance, given the breadth of the mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, prosecutors must regularly make decisions as to which cases are sufficiently serious to warrant a federal charge. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 502 (1985) (Marshall, J., dissenting) ("The only restraining influence on the `inexorable expansion of the mail and wire fraud statutes' has been the prudent use of prosecutorial discretion.") (quoting United States v. Siegel, 717 F.2d 9, 24 (2d Cir. 1983) (Winter, J., dissenting)).

"Indeed, the government's authority to certify that a given case implicates a substantial federal interest is akin to the government's authority to decide which cases to prosecute." United States v. Juvenile Male, 915 F. Supp. 789, 793 (W.D. Va. 1995). The two decisions, in fact, involve precisely the same standard-- the U.S. Attorneys' Manual prescribes that government attorneys undertake a "substantial federal interest" inquiry when deciding whether to initiate a federal prosecution:

> In determining whether prosecution should be declined because no substantial federal interest would be served by prosecution, the attorney for the government should weigh all relevant considerations, including:
>
> 1. Federal law enforcement priorities;
>
> 2. The nature and seriousness of the offense;
>
> 3. The deterrent effect of prosecution;
>
> 4. The person's culpability in connection with the offense;
>
> 5. The person's history with respect to criminal activity.
>
> 6. The person's willingness to cooperate in the investigation or prosecution of others; and

19

7. The probable sentence or other consequences if the person is convicted.

Department of Justice, U.S. Attorneys' Manual § 9-27.230(A) (emphasis added). These sorts of prosecutorial judgments, the Supreme Court has observed, are "particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." Wayte v. United States, 470 U.S. 598, 607 (1985). They are more appropriately left within the sole discretion of the executive, as Congress sought to do here.

The majority's approach is fraught with mischief. Its reasoning would require, in every juvenile proceeding in federal court, that the district court fully reevaluate the government's reasons for invoking a federal forum. The prospect of inter-branch conflict is apparent. Suppose that the Attorney General believes that a particular case involves sufficiently serious violations of the federal criminal code to warrant federal adjudication. A district court, under the majority's interpretation of section 5032, could repudiate the Attorney General's policy determination by subjectively deciding that the case does not merit a federal proceeding. Yet the court's decision would necessarily be based on the sorts of considerations that the Supreme Court held in Wayte are executive (not judicial) in nature. Id.; see United States v. Armstrong, 64 U.S.L.W. 4305, 4308 (U.S. May 13, 1996) ("Judicial deference to the decisions of . . . executive officers rests in part on an assessment of the relative competence of prosecutors and courts" and "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function.").

Moreover, executive determinations under other, similar statutory provisions have been deemed outside the scope of judicial review. Vancier, 515 F.2d at 1381. Examples include a judgment by the U.S. Attorney under 18 U.S.C. § 6003 that compelling a witness to testify is in the public interest, see Ullman v. United States, 350 U.S. 422, 431-34 (1956); United States v. Hooks, 848 F.2d 785, 802 (7th Cir. 1988), certification by the U.S. Attorney under 18 U.S.C. § 3731 that an appeal from an adverse suppression ruling is not taken for pur-

20

poses of delay and involves evidence material to the proceedings, <u>see United States v. Kepner</u>, 843 F.2d 755, 761 (3d Cir. 1988); <u>In re Grand Jury Investigation</u>, 599 F.2d 1224, 1226 (3d Cir. 1979), and certification by the Attorney General under 18 U.S.C. § 3503(a) that the subject of a deposition to preserve testimony is believed to have participated in organized crime, <u>see United States v. Ricketson</u>, 498 F.2d 367, 374 (7th Cir.), <u>cert. denied</u>, 419 U.S. 965 (1974); <u>United States v. Singleton</u>, 460 F.2d 1148, 1154 (2d Cir. 1972), <u>cert. denied</u>, 410 U.S. 984 (1973).**2**

None of this calls into question our authority to review a certification for compliance with the formal requirements of section 5032. <u>See United States v. C.G.</u>, 736 F.2d 1474, 1477 (11th Cir. 1984). But the statute forecloses us from reexamining whether there exists a "substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. We have our job to do under the statute, and the prosecutors have theirs. I would thus hold, as did the district court, that the certification of a "substantial Federal interest" is immune from judicial review.

_____

**2** The Supreme Court's decision in <u>Gutierrez de Martinez v. Lamagno</u>, 115 S. Ct. 2227 (1995), supporting judicial review of the Attorney General's certification under the Westfall Act that an employee was acting within the scope of his employment, turned on concerns not at issue here. Two considerations "weigh[ed] heavily" on the Court's decision -- that the Attorney General argued in favor of judicial review of certification, and that certification was "dispositive of a court controversy." <u>Id.</u> at 2231. Neither of these concerns exists here. <u>See Juvenile Male</u>, 915 F. Supp. at 795; <u>W.P., Jr.</u>, 898 F. Supp. at 850; <u>see also United States v. Tucker</u>, 78 F.3d 1313, 1318-19 (8th Cir. 1996).

21