**UNITED STATES of America**

v.

**D.R., Male Juvenile**

**No. CRIM. 02–358–MG.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 11, 2002.

**2.** At the conclusion of the trial, the jury found   the Defendant Not Guilty on Count II.

Ronald L. Walutes, Jr., U.S. Attorney's Office, Alexandria, VA, for Plaintiffs or Petitioners.

Robert L. Jenkins, Jr., Matthew A. Wartel, Bynum & Jenkins, P.L.L.C., Alexandria, VA, for Defendants or Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

This federal murder prosecution is before the Court on the government's motion to transfer defendant from juvenile to adult proceedings, pursuant to 18 U.S.C. § 5032. For the reasons set forth below, the government's motion to transfer must be granted.

### I.

The procedural history of this case is easily summarized. On August 8, 2002, the government filed under seal a Juvenile Information ·charging defendant with an act of juvenile delinquency, namely murder on· September 16, 2001, of an individual on United States Park Service land, which would be a violation of 18 U.S.C. §§ 2 and 1111 had defendant been over the age of eighteen at the time of the offense. Together with the Juvenile Information, the government also filed a Certification to Proceed under the Juvenile Justice and Delinquency Prevention Act, as well as a motion to transfer defendant from juvenile to adult criminal prosecution, pursuant to 18 U.S.C. § 5032. On September 16, 2002, defendant, by counsel, filed an opposition to the government's certification and motion to transfer, arguing, *inter alia*, (i) that the government's certification is inadequate on its face, and (ii) that the factors listed in 18 U.S.C. § 5032, as they relate to defendant, do not support a transfer in this case. The government filed a reply to defendant's opposition on September 23, 2002, attaching as exhibits various documents pertaining to defendant's educational, psychological and disciplinary background.

On October 3, 2002, a hearing was held on the government's motion to transfer, at which defendant was present and represented by counsel. Also present was defendant's father, who had received proper notice of the hearing in accordance with 18 U.S.C. § 5032.[1] In the course of the hearing, the government presented the testimony of five witnesses: (i) Mark Eisenh-

---

1. Although defendant is able to speak English and did not require the services of an interpreter, interpreters were present at the hearing to provide translation for defendant's father, who does not speak English.

our, the Assistant Principal of Minnie Howard School in Alexandria, Virginia; (ii) Stephen DeWitt, a Probation Officer with the Alexandria Juvenile Court; (iii) Henry Pacheco, a counselor and certified gang specialist with the Multi–Cultural Clinical Center in Springfield, Virginia; (iv) Nora Crawford, a counselor at the Northern Virginia Juvenile Detention Home; and (v) Victor Ignacio, a detective with the City of Alexandria Police Department's Gang Unit.

Also presented by the government and admitted into evidence were the following documents concerning defendant: (i) records maintained by Minnie Howard School, Francis C. Hammond Middle School, John Adams School and Jefferson–Houston School (Exhibit 1); (ii) records maintained by the Alexandria Juvenile Probation Office (Exhibit 2); (iii) records maintained by the Alexandria Juvenile and Domestic Relations District Court, as required by 18 U.S.C. § 5032 (Exhibit 3); (iv) records maintained by Henry Pacheco; (Exhibit 4); (v) records maintained by the Northern Virginia Juvenile Detention Home (Exhibit 5); and (vi) records and warrants pertaining to outstanding state charges against defendant (Exhibit 6).

Defendant presented no additional witnesses, although defense counsel proffered the contents of a report prepared by Hans Solveg, the Clinical Director of the Augustus Institute in Alexandria, Virginia.[2] Defense counsel also requested a continuance of the transfer hearing to allow defendant an opportunity to undergo a "comprehen-

sive mental health evaluation" by a psychiatrist and to present the testimony of this psychiatrist on October 11, 2002. In this regard, defense counsel initially represented that the psychiatrist would be available to testify on October 4, 2002, but later stated in the motion to continue that the psychiatrist would not be available until October 11, 2002. Despite defendant's argument that a psychiatric evaluation is critical to the instant transfer analysis, his motion to continue was denied, as the testimony of the psychiatrist was determined to be unnecessary in light of the information already made a part of the record in this case. Nonetheless, defense counsel was granted leave to obtain the psychiatric evaluation for purposes of any appeal of the transfer determination, and to file a motion for reconsideration in this Court, if appropriate, based on the results of the psychiatric evaluation.

Following the presentation of evidence and the arguments of counsel, findings of fact and conclusions of law were issued orally from the Bench, pursuant to 18 U.S.C. § 5032, culminating in the conclusion that the government's motion to transfer defendant from juvenile to adult status must be granted. Recorded here are the reasons underlying that ruling.

## II.

■ As a preliminary, jurisdictional matter, defendant argues that the government's certification to proceed under the Juvenile Justice and Delinquency Prevention Act, filed on August 8, 2002, is inadequate on its face.[3] Specifically, defendant

---

**2.** Although a subpoena was issued to Mr. Solveg to appear on the date of the scheduled transfer hearing, October 3, 2002, he was not present at the hearing and defense counsel did not seek to enforce that subpoena.

**3.** The relevant certification requirements of 18 U.S.C. § 5032 are as follows:

A juvenile alleged to have committed an act of juvenile delinquency…shall not be pro-

ceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not

claims first that the government has failed to demonstrate the required "substantial federal interest" in the instant case. This argument fails for several reasons, the most obvious being that a substantial federal interest arises from the fact that the alleged murder occurred on United States Park Service land.[4] Moreover, at the time the certification was filed, a federal grand jury had already indicted two adult individuals for the same alleged murder and, as recognized by the Fourth Circuit, there is a significant interest in trying all defendants together. *See, e.g., United States v. Nelson,* 1998 WL 180481 at *2 (4th Cir. Apr.17, 1998). Finally, the fact that 18 U.S.C. § 5032 was amended in 1994 to lower the age at which a juvenile may be transferred to adult proceedings in certain crimes of violence, including 18 U.S.C. § 1111, from fifteen to thirteen, evidences a substantial federal interest in prosecuting such crimes. *See id.*

■ Defendant also claims that the government's certification provides only that the Commonwealth Attorney for Alexandria "has declined" to exercise jurisdiction over the instant offense, not that he "refuses to assume jurisdiction" as specified in the statute. There is simply no legally significant distinction between "declined"

and "refused" in this context, as the Fourth Circuit recognized in *United States v. Under Seal,* 2000 WL 305148 at *1 (4th Cir. Mar.24, 2000). Indeed, the Fourth Circuit there rejected precisely the argument raised here by defendant and, in doing so, refused to adopt what it termed a "strained" interpretation of language. *Id.* There, as here, the panel concluded that the language used "was plainly designed to communicate the Commonwealth's decision not to go forward with the state case against the Juvenile." *Id.*

Thus, contrary to defendant's arguments, the government's certification properly vests this Court with jurisdiction, as there is a "substantial federal interest" in prosecuting murders occurring on federal park land and the Commonwealth has declined to exercise jurisdiction over the instant case.

## III.

On the merits of a motion to transfer, the government bears the burden of proving by a preponderance of the evidence[5] that a transfer of defendant from juvenile to adult status would be in the "interest of justice." *United States v. Juvenile Male # 1,* 86 F.3d 1314, 1323 (4th Cir.1996).

---

have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in... [the Controlled Substances Act or the Controlled Substances Import and Export Act]... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

18 U.S.C. § 5032.

4. The substantiality of the federal interest in this case is underscored by the fact that the Magistrate Court Division of the United States District Court for the Eastern District of Virginia has a busy weekly docket devoted exclusively to misdemeanors occurring on United States Park Service land located in this District. Put another way, if the federal govern-

ment has an interest in prosecuting, and devoting substantial resources to, misdemeanors occurring on federal park land, then surely there is a substantial federal interest in prosecuting a murder occurring on the same land.

5. The preponderance of the evidence standard applies because a transfer hearing is not a criminal proceeding resulting in an adjudication of guilt or innocence, but rather is a civil proceeding resulting in an adjudication of status. *See United States v. Juvenile Male # 1,* 86 F.3d 1314, 1322–23 (4th Cir.1996). The strict rules of evidence therefore do not apply during a transfer hearing and hearsay is admissible. *See United States v. A.R.,* 38 F.3d 699, 703 (3d Cir.1994); *United States v. Doe,* 871 F.2d 1248, 1254–55 (5th Cir.1989).

This test requires district courts to "balance the [rehabilitative] purposes [of the juvenile system] against the need to protect the public from violent and dangerous individuals." *Id.* Thus, "a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the juvenile more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. One Juvenile Male,* 40 F.3d 841, 844 (6th Cir. 1994).

Although the transfer determination is committed to the discretion of the district court,[6] that discretion is not unfettered; there is clear statutory guidance for the exercise of that discretion. Specifically, § 5032 directs district courts confronted with a transfer motion to paint a composite picture of the defendant by considering and making findings on the following six factors:

(i) the age and social background of the juvenile;

(ii) the nature of the alleged offense;[7]

(iii) the extent and nature of the juvenile's prior delinquency record;

(iv) the juvenile's present intellectual development and psychological maturity;

(v) the nature of past treatment efforts and the juvenile's response to such efforts; and

(vi) the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C. § 5032.

In determining whether a transfer to adult status is in the public interest, "the district court need not accord each of the six factors equal weight — the court may balance the factors in any manner it feels appropriate." *United States v. Nelson,* 90 F.3d 636, 640 (2d Cir.1996). Yet, as recognized by the Fourth Circuit, "[i]n the weighing of the various factors, the nature of the crime clearly predominates." *Juvenile Male # 1,* 86 F.3d at 1323. Importantly, however, a transfer proceeding is neither a trial on guilt or innocence, nor a defense discovery mechanism; it is, instead, a proceeding to determine a defendant's status and hence district courts must assume the truth of the offense charged against defendant for purposes of the transfer hearing.[8]

These principles, applied here, point convincingly to the conclusion that a transfer of defendant from juvenile to adult proceedings is appropriate under 18 U.S.C. § 5032. The specific findings with respect to each of the six statutory factors are set forth below.

**A. Age and Social Background**

██ The defendant, born on September 20, 1983, is currently nineteen years old.

---

6. *See Juvenile Male # 1,* 86 F.3d at 1322 (recognizing that "[t]he question of whether the interest of justice is served by the transfer of a juvenile for adult prosecution is a decision within the broad discretion of the district court.") (quoting *United States v. Romulus,* 949 F.2d 713, 715 (4th Cir.1991)).

7. In considering the nature of the offense factor, in particular, "the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms." 18 U.S.C. § 5032.

8. *See One Juvenile Male,* 40 F.3d at 845; *A.R.,* 38 F.3d at 703; *United States v. Nelson,* 68 F.3d 583, 589 (2d Cir.1995) ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the information."); *United States v. Parker,* 956 F.2d 169, 171 (8th Cir. 1992); *United States v. Doe,* 871 F.2d 1248, 1250 n. 1 (5th Cir.1989).

He was approximately seventy five hours shy of eighteen years of age when the alleged murder occurred late in the evening hours of September 16, 2001. Had the murder occurred only three days later, defendant would have been subject to adult prosecution from the outset. Given these circumstances, defendant's age strongly militates in favor of a transfer. *See, e.g., United States v. Smith*, 178 F.3d 22, 27 (1st Cir.1999) ("the proximity of a juvenile's age to age eighteen is another important factor for the court's consideration").

Defendant's social background also weighs in favor of a transfer. Specifically, the record reflects that defendant was raised by his maternal grandparents in a loving environment in El Salvador from birth until the age of eight, at which time he traveled to the United States to live with his biological parents and siblings. Defendant lived with his parents and siblings for several years, but left his parents' home at the age of sixteen to begin independent living. DeWitt, defendant's juvenile probation officer, testified that he visited the family home several times throughout defendant's involvement with the juvenile justice system, and that the majority of his contact was with defendant's mother. DeWitt also testified that defendant's parents were supportive of the juvenile justice system's efforts to rehabilitate their son, but that defendant's relationship with his father was "strained" and difficult at times. And, although defendant advised DeWitt and Pacheco, defendant's designated counselor and mentor, in the Fall of 1999 that he had been physically abused by his father and exhibited tell-tale bruises to them, these allegations were ultimately determined to be unfounded following an investigation by child protective services. Eisenhour, the Assistant Principal at Minnie Howard School, testified that defendant never made any claims of domestic abuse to school officials.

As to defendant's educational background, records from Minnie Howard School in Alexandria, Virginia[9] depict a young person of at least normal intelligence[10] with no documented or observed learning disabilities.[11] Defendant's record as a student reflects poor grades, sporadic attendance and a lengthy disciplinary record.[12] Defendant ultimately terminated his involvement in formal schooling in the ninth grade, but later obtained his GED at the age of seventeen. Prior to his departure from Minnie Howard, school officials performed a psychological evaluation of

9. Minnie Howard is a school devoted exclusively to ninth grade students and thus students typically spend only one year at Minnie Howard. Defendant, however, spent nearly two years at Minnie Howard before he was removed from the public school system, as he did not earn the credits necessary to proceed to the tenth grade.

10. *See infra* Part D.

11. *See infra* Part D.

12. For example, school records reflect that defendant was suspended from school on November 16, 1995, for participating in a planned fight in the boys' bathroom. He was also suspended from riding the school bus on October 16, 1998 for "using profanity and refusing to follow the directives of the bus driver." The following year, defendant was suspended on April 21, 1999 for "pulling the cover off of the fire alarm," on May 7, 1999 for "failing to follow the directives of staff," on June 4, 1999 for "being off school grounds without permission,...cutting classes, and...vandalizing property adjacent to the school," on September 20, 1999 for "threatening another student, spitting at a teacher and his refusal to follow the directives of class," and on September 20, 1999 for "trespassing on an Alexandria City Public School bus, allegedly engaging in gang activities, and allegedly harassing other students." The Alexandria school system also assigned "no-credit" to defendant on February 22, 1999, based on his poor attendance.

defendant in November 1999, in the course of which defendant acknowledged that he has a bad temper. In this regard, the psychological report provides that "[defendant] reported that he becomes angry easily. He said...if there's fighting, I fight. I don't play; I punch them." The psychological report further provides that defendant possesses normal intelligence, although he suffers from a deficit in written language skills, presumably owing to the fact that English is his second language.

A significant aspect of defendant's social background concerns his membership in Mara Salvatrucha, commonly referred to as "MS–13," a violent national gang—the most violent in the Washington D.C. Metropolitan area according to Detective Ignacio of the Alexandria Police Department.[13] There is little reason to doubt defendant's membership in MS–13; it was confirmed by the testimony of all five government witnesses and no testimony was offered to the contrary. And, the record reflects that as defendant's association with MS–13 grew, his school performance declined and his involvement in criminal behavior apparently increased. Particularly telling is defendant's admission to a Juvenile Home counselor in approximately 2001 that he, the defendant, "was a different person in the streets."

All of these circumstances persuasively point to the conclusion that defendant's age and social background strongly militate in favor of a transfer to adult status.

## B. Nature of the Offense

In the Juvenile Information, defendant is charged with unlawfully, knowingly and willfully, with premeditation and malice aforethought, murdering an individual on federal park land by means of stabbing with knives. This offense, which is as-

sumed to have been committed by defendant for purposes of this transfer proceeding,[14] is particularly heinous given the alleged premeditation and the egregious fatal injuries suffered by the victim. In this regard, Detective Ignacio testified that the victim suffered multiple stab wounds to his throat, chest and hands, and that a part of the victim's throat had been completely removed from his body. Given that the nature of the offense is the predominant transfer factor in this circuit, the very serious nature of the instant offense militates strongly in favor of transfer. *See Juvenile Male # 1*, 86 F.3d at 1323 ("[i]n the weighing of the various [§ 5032] factors, the nature of the crime clearly predominates").

The record further reflects that defendant played "a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms," an additional factor to be considered in connection with the nature of the offense analysis. 18 U.S.C. § 5032. Indeed, both Pacheco and Detective Ignacio testified that defendant is a prominent member of MS–13, a violent national gang associated with various criminal activities including murder, robbery, larceny, assault, destruction of property, witness intimidation, prostitution, and drug trafficking. Pacheco and Ignacio further testified that MS–13 members are known to carry and use various weapons, including machetes, knives, sticks, baseball clubs, broken bottles, golf clubs, and, as relevant here, some firearms, including hand guns. Pacheco also testified that he learned "on the street" from other gang members that defendant is "very charismatic" and that he used this quality to recruit other young individuals to join MS–

---

**13.** *See infra* Part B.

**14.** *See One Juvenile Male,* 40 F.3d at 845; *Nelson,* 68 F.3d at 589.

13 and to "raise up" his local MS–13 "clique." [15] Thus, like the nature of the offense, defendant's leadership role in a violent gang engaged in drug trafficking and the use of firearms, among other criminal activities, weighs strongly in favor of a transfer in this case.

### C. Prior Delinquency Record

Defendant's first involvement with the Juvenile Justice System occurred in 1996, at the age of twelve, when he was initially charged with the felonious assault of a fellow student, a charge that was later reduced to assault and battery. Defendant was found guilty of this offense and placed on probation for a period of six months. According to DeWitt, defendant's probation period passed without incident. Yet no more than two years later, on February 17, 1998, defendant was charged with theft of less than $200 from Hecht's Department Store. He pled guilty to this offense and was again placed on probation in June 1998. Defendant was next charged on June 3, 1999, at the age of fifteen, with damaging property valued at less than $1,000. This offense, together with the fact that he had been suspended from school, also constituted violations of his probation conditions. Ultimately, defendant pled guilty to both the destruction of property offense and the probation violations, after which he was continued on probation and ordered to stay away from the scene of the offense. Defendant was next charged with disorderly conduct on September 20, 1999, to which he pled not guilty. He was nonetheless found guilty of this offense in October 1999, but was simply continued on probation.

The following year, on March 29, 2000, defendant was charged with trespassing and with carrying a knife on school property. He was found guilty of these offenses in June 2000, after which he was continued on probation and sentenced to five days imprisonment. Defendant's final violation of probation occurred in September 2000, when he failed to appear at a scheduled appointment and failed to comply with his curfew. He was found guilty of these offenses on September 15, 2000, and ordered to be committed. As an alternative to confinement, in September 2000, defendant was placed in the Post–Dispositional Program at the Northern Virginia Juvenile Detention ·Home, where he remained until his release in March 2001. The instant murder occurred six months later.

In addition to this lengthy juvenile record, there is also an outstanding warrant against defendant in Arlington County for offenses allegedly committed prior to the instant murder, namely the offenses of receipt of stolen property, grand larceny and possession of burglary tools. It is significant to note that as to these far less serious offenses, allegedly committed by defendant when he was younger than at the time of the instant offense, the State petitioned for and obtained a transfer to adult status. And, in this regard, it is also worth noting that were the instant murder charge prosecuted in state rather than federal court, defendant would have been subject to mandatory transfer to adult status if, following a preliminary hearing, probable cause was found to exist. *See* Va.Code § 16.1–269.1(D).

In the circumstances, defendant's lengthy juvenile record clearly militates in

15. Defendant's leadership role in MS–13 was confirmed by Assistant Principal Eisenhour, who testified (i) that defendant "was associated with MS–13," (ii) that he was a "negative leader" at Minnie Howard School, (iii) that other students "seemed to look up to him," (iv) that he "could stir things up and had a following," and (v) that he "was usually leading others" when disciplinary incidents occurred on school grounds.

favor of a transfer to adult status in this case.

### D. Present Intellectual Development and Psychological Maturity

Both DeWitt and Pacheco testified that defendant is very bright with no discernible learning deficiencies or mental disabilities. Crawford, who observed defendant on a daily basis during defendant's participation in the Post–Dispositional program, similarly testified that defendant is a "very, very smart kid," "very bright," and "very capable of understanding." Like DeWitt and Pacheco, Crawford never observed that defendant suffered from any learning deficiencies or mental disabilities. And, as confirmed by Crawford, handwritten essays written by the defendant in the course of the Post–Dispositional program reflect his above average level of intelligence and his quite adequate understanding of, and facility with, the English language. Moreover, the fact that defendant's last month in the Post–Dispositional program may have passed without incident[16] reflects nothing more than that defendant is clever enough to behave appropriately in that context, but then revert to criminal behavior upon his release.

Defendant's school records are consistent with the observations of DeWitt, Pacheco and Crawford. Specifically, Eisenhour testified that defendant's teachers all described him as being intelligent with no learning deficiencies, but that he received poor scores because he did not "apply himself" at school. Eisenhour further testified that based on his own interactions with defendant, he believed defendant to be of average intelligence or higher. Eisenhour also never had a problem communicating with the defendant in English, or vice versa. Defendant's intellectual abilities are further reflected in the fact that he obtained his GED at the age of seventeen, without the benefit of any formal education beyond the ninth grade.[17]

As to defendant's psychological maturity, Eisenhour testified (i) that defendant knew how to interact with adults, (ii) that he was not disrespectful or confrontational with authority figures, and (iii) that he was more mature than most students. Indeed, according to Eisenhour, defendant's mature demeanor was one of the reasons why others students followed his lead in engaging in negative behavior at school. Like Eisenhour, DeWitt testified that defendant was always respectful of authority. Pacheco, in turn, testified that defendant was "very charismatic" and "tends to bring people toward him." In light of these findings, defendant's intellectual development and psychological maturity also weigh in favor of a transfer in this case.[18]

### E. Past Treatment Efforts and Responses

Despite the significant rehabilitative efforts afforded defendant by the Alexandria juvenile justice system, his criminal behavior and involvement in MS–13 have continued, and indeed worsened over the years.

---

**16.** Prior to his last month in the Post–Dispositional program, defendant was involved in a fight with another resident that nearly resulted in his removal from the program and his immediate incarceration. Counselor Pacheco, however, successfully requested that defendant be permitted to remain in the program until completion.

**17.** Also worth noting is that defendant demonstrated tenacity in pursuing the GED; he failed the GED examination twice before earning a passing mark on the third attempt.

**18.** Defendant argues that psychological testing would likely disclose that he is learning disabled. Even assuming this is so, it would not alter the results of the transfer calculus given the weight of the findings on this and other factors.

The juvenile justice system has attempted to rehabilitate defendant through various means, including (i) sentencing defendant to periods of probation and incarceration, (ii) offering him home and mental health counseling, (iii) assigning him to the Transitional Living Program, a program aimed at providing defendant an opportunity to live independently in a group home environment, (iv) placing him in the Post–Dispositional program, an alternative to confinement that offers juvenile defendants various educational services, behavior modification and anger management programs, and group interaction, and (v) referring him to a certified gang specialist, namely, Pacheco. DeWitt testified that thousands of dollars, "probably more than average," have been expended on efforts to rehabilitate defendant through the juvenile justice system.

Despite these significant efforts, it appears that defendant's criminal activities, including violent gang behavior, have not abated. Indeed, indicative of defendant's failure to respond to past rehabilitative efforts are the numerous adult charges currently pending against him in state court for offenses occurring after the instant murder.[19] These pending charges demonstrate that defendant has unfortunately chosen to continue engaging in criminal behavior, including violent acts,

all of which is likely connected to his continuing involvement in MS–13. In this regard, Counselor Pacheco testified that "he did everything he could" to encourage defendant to disassociate himself from MS–13. And, although Pacheco believed in July 2001 that defendant had perhaps "flipped out," i.e., successfully removed himself from MS–13, he now knows that the juvenile justice system's significant rehabilitative efforts ultimately proved fruitless, as it appears defendant remains affiliated with MS–13. Persuasive confirmation of this is the fact that the other four persons alleged to have been involved in the murder[20] are apparently also members of MS–13.

Thus, in light of the many programs and resources devoted to defendant's rehabilitation in the juvenile justice system, and the fact that he has failed to respond positively to these significant and costly efforts, it follows that this factor militates strongly in favor of a transfer.

### F. Availability of Juvenile Programs

Although the Alexandria juvenile justice system offers various rehabilitative programs and services to qualifying juveniles, Probation Officer DeWitt testified that there is insufficient time to rehabilitate this particular defendant in the juvenile

---

19. These charges include (i) Possession of Stolen Property (Vehicle) (Loudoun County—March 18, 2002), (ii) Reckless Driving and Hit and Run (Loudoun County—March 18, 2002), (iii) Attempt to Maliciously Shoot with the Intent to Maim, Disfigure, Disable or Kill (Arlington County—June 4, 2002), (iv) Point, Hold or Brandish a Firearm (Arlington County—June 4, 2002), (v) Intent to Maim, Disfigure, Disable, Kill or Maliciously Wound (City of Alexandria—June 9, 2002), (vi) Knowingly and Willfully Participate in a Criminal Act for the Benefit or Direction of a Criminal Street Gang by Maliciously Wounding (City of Alexandria—June 9, 2002), (vii) Theft of an Automobile (Fairfax County—June 10, 2002), (viii) Use of a Firearm While Committing Malicious Wounding (Fairfax County—June 10, 2002), (ix) Malicious Shooting with the Intent to Maim, Disfigure, Disable or Kill (Fairfax County—June 10, 2002), and (x) Actively Participate or be a Member of a Criminal Street Gang and Knowingly and Willfully Participate in a Criminal Act Committed for the Benefit of, at the Direction of, or in Association with a Criminal Gang (Fairfax County—June 10, 2002). Detective Ignacio testified persuasively that all of these charges are related to defendant's continued involvement in MS–13.

20. These four individuals are Andy Salinas, Angel Barrera, Fredie Baires and H.A., a juvenile. Both Baires and H.A. are currently fugitives.

system given his present age and past failed rehabilitative efforts. Indeed, as the cutoff for offering juvenile rehabilitative services is age twenty-one, it is clear that in the less than two years remaining, it is unrealistic to expect that the juvenile system can either rehabilitate defendant, or ensure that the community is safe from any further violent and criminal behavior on the part of defendant. Because the adult system will not operate under any similar two-year handicap, this factor, like all of the other statutory factors, weighs strongly in favor of transferring defendant to adult status.

## IV.

In sum, (i) because the government's certification is proper on its face, (ii) because all six of the statutory factors set forth in 18 U.S.C. § 5032 militate in favor of a transfer in this case, and (iii) because the risk of harm to the community posed by affording defendant more lenient treatment within the Alexandria juvenile justice system significantly outweighs his potential for rehabilitation, the government's motion to transfer defendant from juvenile to adult proceedings must be granted in the "interest of justice." [21] *See Juvenile Male # 1*, 86 F.3d at 1323; *One Juvenile Male*, 40 F.3d at 844. An appropriate Order has issued.

---

21. It is significant to note that Probation Officer DeWitt testified that given defendant's age, the nature of the instant offense, and defendant's negative response to past juvenile rehabilitative efforts, he would recommend transferring defendant to adult status in this case.