PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES SCOTT ROBINSON,
*Defendant-Appellant.*

No. 04-4388

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

JAMES SCOTT ROBINSON,
*Defendant-Appellee.*

No. 04-4417

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CR-02-80-H)

Argued: March 17, 2005

Decided: April 18, 2005

Before WILLIAMS, MOTZ, and SHEDD, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Motz and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** James M. Ayers, II, New Bern, North Carolina, for James
Scott Robinson. Felice McConnell Corpening, Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Raleigh, North Carolina, for the United States. **ON BRIEF:** Frank D.
Whitney, United States Attorney, Anne M. Hayes, Assistant United
States Attorney, Raleigh, North Carolina, for the United States.

**OPINION**

WILLIAMS, Circuit Judge:

James Scott Robinson, a juvenile tried as an adult, appeals his con-
viction and sentence for engaging in a string of armed robberies tar-
geting grocery stores and banks. The Government has cross-appealed,
asserting that the district court erred by sentencing Robinson to 384
months imprisonment. For the following reasons, we affirm Robin-
son's conviction but remand the case to the district court for resen-
tencing.

I.

Robinson was born on December 27, 1984. In his early childhood,
he was abused by his mother, who was convicted of felony child
abuse when Robinson was three years old. Following his seventh
birthday, Robinson and his younger sister moved in permanently with
his paternal grandmother, Rosalie Crisp, who attempted to give Rob-
inson a stable home environment. Robinson has not seen his mother
since that time, and Robinson's father has been incarcerated since
approximately that same time. Robinson had trouble in school, and
his I.Q. scores were generally below average, ranging from 74 to 90.
Robinson was placed on juvenile probation in April 2001 for possess-
ing 6.6 grams of marijuana in school. At that time, Robinson was in
the eighth grade. Robinson was expelled from school for that offense
and transferred to a school for students with special needs or behav-
ioral problems, but he was frequently suspended from the school for
aggressive behavior. In 2000, at the age of fifteen, Robinson began

committing robberies with a friend, Anthony Sanders. Sanders was twenty-four years old at the time. Sanders and Robinson committed their first robbery on October 28, 2000, robbing a Food Lion in Clayton, North Carolina. After Robinson indicated that he needed some money, Sanders suggested they rob something. Wearing ski-masks and carrying handguns, they went to the store's office and demanded money; they received approximately $3,000 in cash and $3,000 in checks.

The next robbery occurred on December 20, 2000 at a Piggly Wiggly store in Smithfield, North Carolina. On this occasion, Robinson robbed the store by himself, and Sanders picked him up from Robinson's half-sister's house after the robbery. While Robinson was carrying out this robbery, a man wearing a Santa Claus suit tried to apprehend him, and Robinson fired his gun into the air inside the store to scare him away. Robinson obtained about $800 from this robbery.

Next, on December 27, 2000, Sanders, Robinson, and another friend, Kenny Horne, robbed the Four Oaks Bank in Smithfield, North Carolina. Robinson again committed the actual robbery by himself and hid at Horne's cousin's house until Sanders and Horne could come for him. During the robbery, Robinson wore a ski mask and carried a handgun. Robinson approached the teller, demanded money, and ultimately cocked the gun and threatened to kill her if she did not give him the money. Robinson then obtained money from a second teller's till as well. Robinson netted $16,000 from this robbery.

On January 10, 2001, Robinson, Horne, and Sanders went to rob a Food Lion in Wilson, North Carolina. Sanders went in the store to survey it and then exited. Robinson, wearing a dress belonging to Sanders' wife over his clothes and a ski mask, entered the store armed with a handgun and demanded to be let into the office. Robinson also demanded money from the safe, but it was closed and could not be opened. During this time, Robinson had his gun pointed at the store employee's head. Robinson left the store with $2,000. Believing that he was being followed by the police, he jumped a fence, disposed of the dress, gun, and money, hid for a while, and then strolled through a housing development.

While walking through the development, Robinson was stopped by a Wilson police officer. The officer asked Robinson his name and address; Robinson responded that his name was "Junior Crisp," and he gave his grandmother's address as his own. Robinson had scuff marks on his hands and a hole in his jeans. Robinson told the officer he was searching for a relative who lived somewhere in the development. Robinson agreed to accompany the officer to the Food Lion for a "show up," but none of the employees identified him. After the officer released Robinson near the development, Sanders and Horne found him. The three men then drove to a nearby home where Robinson recovered the items he had left.

After further investigation, Wilson Police Detective Bass obtained an arrest warrant for Robinson. Bass served the warrant on January 12, 2001 at Crisp's home. Detective Bass read Robinson the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966),[1] and Robinson indicated he understood those warnings. Robinson and his grandmother both signed a form indicating that the *Miranda* warnings had been read to him. Robinson was taken to the Wilson County Jail where he was questioned. Robinson denied his involvement in the robbery at that time.

On January 30, 2001, Robinson was visited in jail by Sergeant Martin, of the Smithfield Police Department, who wanted to question Robinson regarding the Four Oaks Bank and Piggly Wiggly robberies. Martin advised Robinson of his juvenile *Miranda* rights, and Robinson signed a waiver of rights form. At no point did Robinson indicate that he did not understand those rights. Robinson again denied his involvement in any robbery at that time.

After being released, Robinson continued his spree. On May 25, 2001, Robinson told Horne, Sanders, and Travis Groves, Sanders's younger brother, that he needed a ride so he could commit a robbery. The four individuals traveled to Smithfield, North Carolina, where they decided to rob the Food Lion. Robinson again committed the

---

[1]Bass actually read Robinson rights from a juvenile *Miranda* form, which specified that, in addition to the rights guaranteed by *Miranda*, Robinson had the right to request the presence of a parent or guardian during questioning.

crime, wearing a mask over his face and entering the store carrying a handgun. As Robinson fled around back of the store where Sanders, Groves, and Horne were waiting in the getaway car, a store employee gave chase. Robinson turned, aimed the gun at the employee, and fired it at him. The four men then escaped with approximately $1,200.

On June 1, 2001, Robinson told Sanders, Horne, and Groves that he had discovered a bank they could rob. Sanders, Groves, and Robinson drove to Garner, North Carolina, to survey the bank in question. After deciding where to pick up Robinson after the robbery, Sanders and Groves dropped Robinson off near the bank. Robinson entered the Dixie Construction Company office, which was located in the Bank of America building. Robinson drew his handgun and demanded money from a female employee, who informed him the bank was next door. Robinson then put a gun to the woman's back and walked her outside and then into the bank. After Robinson entered the bank, he released the employee, approached a teller, handed her a pillowcase, and told her to fill it with money. The teller put $13,226 in the pillowcase and also placed a dye pack in the pillowcase. As Robinson fled through a wooded area behind the bank, the dye pack exploded in the pillowcase. Robinson left the pillowcase and the money in the woods and returned to Groves and Sanders. Robinson later went back to look for the money, but it was gone. In fact, police officers located the money shortly after the robbery. Also recovered by police were a pair of gloves, a mask, and a handgun.

On August 18, 2001, Sanders, Groves and Robinson were bored and decided to drive around looking for something to rob. They settled on the Food Lion in Fuquay-Varina, North Carolina. Groves surveyed the store under the guise of requesting a job application. He returned and told Sanders and Robinson the store layout. Sanders and Robinson then donned masks and entered the store with guns drawn. They obtained $2,000 from the store's safe before fleeing.

Next, on August 21, 2001, Robinson, Sanders, and Groves decided to rob the First Citizens Bank in Smithfield, North Carolina. After Sanders called a bomb threat to the local Wal-Mart to divert police attention, Robinson entered the bank wearing a hood and carrying a handgun. Robinson pointed the gun at a teller and handed her a pillowcase to fill. The teller complied with Robinson's demands and

filled the pillowcase with money from her till. Robinson then exited the bank carrying the pillowcase. Unfortunately for Robinson, however, a brave citizen followed him and called 911, informing officers that Robinson had entered an apartment complex.

Police in an unmarked car responded to the call and began patrolling the apartment complex. The police came upon a slow-moving vehicle with two individuals inside. Both were constantly looking out the windows, as if searching for someone. The officers followed the car until it stopped and the two individuals exited the car and entered a nearby apartment. The officers approached the apartment and received permission to search the premises. The officers discovered the money, the pillowcase, and clothing that matched that worn by the robber. Robinson, Sanders, and Groves were also inside the apartment.

The police arrested Robinson, Sanders, and Groves and took them to the Smithfield Police Department where they were interviewed separately. Robinson was informed of his juvenile *Miranda* rights and stated that he understood those rights. Robinson refused to sign a *Miranda* waiver form, but he agreed to answer questions. Robinson also stated that he did not want a lawyer or his grandmother present. Robinson initially denied participating in the robbery, but after being told that Sanders and Groves were cooperating, Robinson admitted to participating in the First Citizens Bank robbery, the December 20, 2000 Piggly Wiggly robbery, the December 27, 2000 Four Oaks Bank robbery, the June 1, 2001, Bank of America robbery, and the August 18, 2001 Food Lion robbery.

On March 19, 2002, the Government filed a twenty-eight count juvenile information against Robinson. The information charged Robinson with conspiracy to commit armed bank robbery, armed bank robbery, attempted bank robbery, and various firearms and Hobbs Act offenses. Both the Government and Robinson filed motions for competency exams. The Government also filed a motion to transfer Robinson to adult status for trial.

Robinson was sent to the Dakota Horizons Youth Center (Dakota Center) in North Dakota for evaluation, treatment, and detention. While there, Dr. Alan Fehr, a clinical psychologist, performed a thor-

ough psychiatric examination of Robinson. Dr. Fehr administered 15 tests to Robinson, including the Weschler Adult Intelligence Test - 3rd Edition. Robinson scored a 70 on this I.Q. test. Based on the examination and testing, Dr. Fehr prepared a report concluding that Robinson was competent to stand trial.

Colby Braun, the director of the Dakota Center, testified that during the two months Robinson spent at the Center, he was involved in several altercations and verbal spats with other youths or with staff. Braun also testified that Robinson told him he created a homemade weapon in order to be "one up" on the other youths at the Dakota Center. (J.A. at 117.) In Braun's opinion, some of Robinson's behavior was that of an adult criminal.

The district court held a hearing to determine Robinson's competency to stand trial, and also to resolve the Government's motion to transfer Robinson to adult status. The district court granted the Government's motion for transfer and concluded that Robinson was competent to stand trial. The Government then filed a twenty-count indictment against Robinson. Robinson was charged with three counts of conspiracy, in violation of 18 U.S.C.A. § 371 (West 2000); three counts of armed bank robbery, aiding and abetting, in violation of 18 U.S.C.A. § 2113(a) (West 2000); six counts of brandishing a firearm during a crime of violence, in violation of 18 U.S.C.A. § 924(c) (West 2000); one count of attempted bank robbery, in violation of 18 U.S.C.A. § 2213(a)(2) (West 2000); five counts of interfering with commerce by robbery, aiding and abetting, in violation of 18 U.S.C.A. § 1951 (West 2000); and two counts of discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c).

Robinson refused the Government's offer of a plea bargain, pleaded not guilty, and continued to trial.[2] The district court, upon the Government's motion, dismissed the count of attempted robbery. Robinson was convicted on the remaining counts. After a sentencing hearing, the district court granted Robinson's request for a downward

---

[2]Sanders and Groves both pleaded guilty to their roles in the robberies and testified against Robinson at trial. Sanders received a sentence of 144 months imprisonment, and Groves received 96 months imprisonment.

departure for diminished capacity over the Government's objection and sentenced Robinson to a total of 384 months imprisonment and five years supervised release.

## II.

On appeal, Robinson has raised numerous challenges to his conviction and one challenge to his sentence. Robinson contends that he was not competent to stand trial, that the district court should not have transferred him to adult status, and that he was not competent to waive his *Miranda* rights.[3] Robinson also asserts that his sentence violates the rule of *United States v. Booker*, 125 S.Ct. 738 (2005). The Government has cross-appealed Robinson's sentence, contending that the district court erred in granting Robinson a downward departure for diminished capacity, and in departing below the statutory minimum provided for Robinson's § 924(c) convictions.

## III.

Robinson's primary argument on appeal is that he was not competent to stand trial. We review the district court's competency determination for clear error. *United States v. Cox*, 964 F.2d 1431, 1433 (4th Cir. 1992). Courts examining the competency of a defendant must determine if "[the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960). Under federal law the defendant has the burden, "by a preponderance of the evidence [to show] that the defendant is presently suffering from a mental disease or defect rendering him mentally

---

[3]Robinson raises two other issues relating to his conviction that do not warrant discussion. Robinson argues that the Government did not produce sufficient evidence to sustain the convictions and that the district court committed reversible error in refusing to instruct the jury on the defense of diminished capacity. We have reviewed the record, briefs, and oral argument on these issues and find them to be clearly without merit. There was overwhelming evidence of Robinson's guilt, and Robinson failed to submit sufficient evidence to permit the district court to give a diminished capacity jury instruction.

incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C.A. § 4241(d) (West 2000). *See also Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.").

The district court ruled that Robinson was competent because of the un-rebutted testimony and report of Dr. Fehr. As noted, Dr. Fehr performed an extensive psychological examination of Robinson and prepared a report following that examination. Robinson's I.Q., as tested by Dr. Fehr, is 70, which is borderline functional. Robinson's previous I.Q. scores were 74 (age six), 90 (age nine), 87 (age eleven), and 84 (age fourteen). Dr. Fehr noted repeatedly in his report that he had difficulty evaluating Robinson because Robinson had trouble staying on task and did not always appear to give full effort to the testing. In addition, "James presented in a fairly dramatic manner, perhaps to the point of being considered theatrical." (J.A. at 292.) Dr. Fehr did note that Robinson had a variety of mental disorders, including attention-deficit/hyperactivity disorder (ADHD), reading disorder, mathematics disorder, expressive language disorder, provisional poly-substance abuse, schizotypal personality disorder, and borderline intellectual functioning. Dr. Fehr conceded "it is quite possible that he has some subtle neurological problems," and "[i]t is also possible that he has some borderline psychotic features." (J.A. at 294.)

Dr. Fehr found Robinson's "perceptions are faulty and his thinking is odd and loose. However, he does not appear to be mentally ill . . . . [Indeed, h]e appears to have *at least a minimal understanding* of legal procedures, rules and expectations." (J.A. at 294) (emphasis added.) Dr. Fehr also concluded that Robinson was not mentally retarded and that he was "at least minimally able to understand the nature and consequences of the proceedings against him." (J.A. at 294.) In addition, Dr. Fehr opined that "[Robinson] appears to be at least minimally able to understand the nature and consequences of the proceedings against him and to assist properly in his defense." (J.A. at 294.)

Dr. Fehr also testified during the competency hearing and reiterated his opinion that Robinson was competent to stand trial. Dr. Fehr testi-

fied: "I don't believe that he has a psychotic disorder. [I do] believe that he has what I've referred to or diagnosed as a schizo-typo [sic] personality disorder which relates more to a personality style that involves some looseness, some magical thinking, things of that nature." (J.A. at 78.) Dr. Fehr felt that "[i]n terms of being minimally competent . . . he came up above the line, but not much above the line." (J.A. at 83.)

Following this hearing, the district court ruled that Robinson was competent, finding Dr. Fehr's report and testimony persuasive. The district court found that Robinson did not have a mental disease, was not mentally retarded, and that Robinson, while lacking in academic prowess, possessed "overall intellect or common sense." (J.A. at 211.) In making this latter finding, the district court referred to "the planned nature of the robberies, his wherewithal to hide out for several hours after a robbery to prevent detection, as well as his ability to give an alias to police." (J.A. at 211.)

We do not believe that the district court clearly erred in reaching this finding. Robinson had the burden of proving that he was incompetent to stand trial. The only expert before the district court, Dr. Fehr, testified that Robinson was competent. Robinson contends that, according to some of the testing performed by Dr. Fehr, he operates at the level of an eleven year-old. The fact that some of Robinson's test scores indicate a low intellectual ability does not, however, undermine Dr. Fehr's ultimate conclusion that Robinson was competent. Robinson also points to the fact that, in response to a question on cross-examination regarding whether Dr. Fehr had concluded that Robinson was competent as a juvenile, Dr. Fehr stated his "assumption of course was that [he] was asked to determine competency as a juvenile." (J.A. at 85.) Given this statement, Robinson argues, Dr. Fehr's testimony is not relevant as to whether Robinson was competent to be proceeded against as an adult in federal district court. Robinson's argument, however, takes Dr. Fehr's statement out of context and, in any event, on redirect examination Dr. Fehr opined again that Robinson was competent to stand trial. Moreover, even if Dr. Fehr's testimony loses some of its persuasive force because of this alleged concession, we are left with the simple fact that Robinson failed to put forth any evidence to support a finding that he was incompetent. Although Robinson does appear to be of low intelligence and to have

several mental disorders, we do not believe the district court clearly erred in ruling that Robinson was competent to stand trial.

IV.

Robinson's next argument is that the district court should not have transferred him to adult status. Persons who violate federal criminal laws before the age of eighteen are adjudged juvenile delinquents. 18 U.S.C.A. § 5031 (West 2000). The purpose of § 5031 is to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990). Juveniles can, however, be transferred to adult status and prosecuted in federal court when, relevant here, the Attorney General "certifies to the appropriate district court that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of federal jurisdiction." 18 U.S.C.A. § 5032 (West 2000). If such a certification is made, the district court can transfer the juvenile upon finding, after a hearing, that "such transfer would be in the interest of justice." *Id.* To make this determination, the district court examines six factors: (1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the present intellectual and psychological development and maturity of the juvenile; (5) the nature of past treatment efforts and the effect of such efforts; and (6) the availability of programs to treat the juvenile's behavioral problems. *Id.* at ¶ 5.

The Government has the burden of proving that a transfer would be in the interest of justice by preponderance of the evidence. *United States v. Juvenile Male # 1*, 86 F.3d 1314, 1323 (4th Cir. 1996) (*Juvenile Male # 1* (4th Cir.)). The district court "may determine what weight to give the various factors," although, "[i]n the weighing of the various factors, the nature of the crime clearly predominates." *Id. See also United States v. One Juvenile Male*, 40 F.3d 841, 845-46 (6th Cir. 1994) (collecting cases). Ultimately, a court should "balance the [rehabilitative] purposes against the need to protect the public from violent and dangerous individuals." *United States v. Juvenile Male # 1*, 47 F.3d 68, 71 (2d. Cir. 1995) (*Juvenile Male # 1*(2d Cir.)). "A

glimmer of hope in future treatment, standing alone, would be insufficient to warrant a finding that rehabilitation is likely." *United States v. Nelson*, 68 F.3d 583, 590 (2d Cir. 1995).

We review a district court's ultimate decision to transfer a juvenile to adult status for abuse of discretion. *Juvenile Male # 1* (4th Cir.), 86 F.3d at 1324. "An abuse of discretion occurs if the district court fails to make the required factual findings, or if those factual findings are clearly erroneous." *Juvenile Male # 1*(2d Cir.), 47 F.3d at 71 (citations omitted).

The district court conducted an extensive hearing before concluding that, in the interest of justice, Robinson should be transferred to adult status. The district court concluded that four of the factors weighed in favor of a transfer, one factor was neutral, and one favored denying the transfer request. Specifically, the district court found that Robinson's age and social environment, the nature of the crimes alleged, Robinson's intellectual development and psychological maturity, and Robinson's response to past treatment efforts weighed in favor of a transfer. The district court found that the availability of juvenile programs was neutral given the unpredictability of open beds at such facilities in the region, and that the Government had failed to prove an extensive juvenile record.

A review of the district court's findings as to each factor leads us to conclude that the district court did not abuse its discretion in transferring Robinson to adult status. First, we agree with the district court that Robinson's age and social environment favored a transfer. Robinson was 15 and 16 at the time he committed his crimes, and 18 at the time of his transfer hearing. Robinson committed his crimes in North Carolina, and under that state's law, he also could have been tried as an adult. N.C. Gen. Stat. § 7B-2200 (2003). Moreover, Robinson's grandmother testified that Robinson had a stable home life after he moved in with her at the age of seven. Although Robinson's early years with his mother were not pleasant by any stretch of the imagination, Robinson had been provided with a loving home for eight years prior to committing the crimes in question. We believe this factor weighed in favor of a transfer.

Most importantly, we agree with the district court's determination that the nature and severity of the alleged crimes weighed heavily in

favor of a transfer. Robinson was charged with a number of serious, violent crimes. As noted, in determining if a transfer is in the interest of justice, the nature and severity of the crimes is the most important factor. Robinson was charged originally with nine armed robberies, and with discharging his weapon during at least two of those robberies. He was alleged to have carried a firearm during each robbery. Thus, the nature and severity of the crimes weighs heavily in favor of transfer because it implies a need to protect the public. *See Juvenile Male # 1*(2d Cir.), 47 F.3d at 71.

Next, we do not believe the district court clearly erred in finding that the third factor, Robinson's prior delinquency record, weighed against a transfer. We note, however, that while Robinson's only actual delinquent behavior occurred when he was found with 6.6 grams of marijuana on his person at school, this act occurred in the midst of the robbery spree that resulted in Robinson's federal prosecution. In addition, while Robinson had only one prior delinquent behavior, "[Robinson's] juvenile record, while perhaps not extensive, is still a record." *Juvenile Male # 1* (4th Cir.), 86 F.3d at 1323. Nonetheless, because Robinson did have only one prior act of delinquency, we will not disturb the district court's finding that Robinson's prior delinquency record does not weigh in favor of a transfer.

Turning to the fourth factor, we agree with the district court that Robinson's intellectual development and psychological maturity weighed in favor of a transfer. The district court concluded that this factor favored a transfer because, "[v]iewing the possibility of rehabilitation as the ultimate issue . . . . the defendant's comportment . . . reveals that defendant has not been amenable or interested in furthering his education." (J.A. at 217.) We agree. While Robinson lacks academic prowess, he was wiley enough to give a false name to a police officer to avoid capture on one occasion and was able, on several occasions, to wait substantial periods of time to be picked up by the getaway car following robberies. Moreover, Colby Braun of the Dakota Center, where Robinson was held following his arrest, testified that he believed some of Robinson's behavior was that of an adult criminal, and not a juvenile.

Next, the district court found, and we agree, that the nature of past treatment efforts and Robinson's response to those efforts weigh

heavily in favor of a transfer. Evidence adduced at the hearing indicated that Robinson misbehaved everywhere he was sent. He was suspended from the school for troubled youths, and he was in two fights and several other verbal altercations during the two month period he spent at the Dakota Center for juveniles. In fact, Robinson even fashioned a homemade weapon during his time at the Dakota Center. Thus, this factor too weighs in favor of a transfer.

Finally, the district court did not clearly err in finding that the availability of facilities to treat Robinson was a neutral factor. The Government put forth the testimony of a probation officer, who testified that Shelby, Tennessee was the only regional facility with juvenile programs. Space was not always available at the facility, and it only held juveniles until the age of 21. At the time of the hearing, Robinson was eighteen and a half years old, and Dr. Fehr testified that Robinson required at least five years of treatment in a residential facility.

Given the record before the district court, and its factual findings on that record, we do not believe it abused its discretion in transferring Robinson to adult status.

V.

Robinson next contends that the district court erred by denying his motion to suppress post-arrest statements given by Robinson to police officers on August 21, 2001, in which he admitted complicity in several of the robberies.[4] Robinson contends that, because of his limited intellectual ability, the Government failed to prove that he knowingly waived his *Miranda* rights. When reviewing a district court's suppression ruling, we review factual findings for clear error and the ultimate legal question de novo. *United States v. Holmes*, 376 F.3d 270, 273 (4th Cir.), *cert. denied* 125 S.Ct. 633 (2004).

---

[4]Robinson waived his juvenile *Miranda* rights and gave statements to police officers on three occasions; January 12, 2001, January 30, 2001, and August 21, 2001. On appeal, Robinson only contests the statements given on August 21.

The Government has the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was knowing and voluntary. The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice," and also it must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To determine whether the Government has met its burden, we examine the "totality of the circumstances." *Id.*

Robinson does not contend that his waiver was involuntary, but rather argues that, given his age at the time of the interrogation, and his mental ability, he was per se incapable of knowingly waiving his *Miranda* rights.

The district court held a hearing on the suppression motion at which Special Agent Hicks of the North Carolina State Bureau of Investigation testified. Agent Hicks, who questioned Robinson on August 21, testified that he read all of the juvenile *Miranda* rights to Robinson and that Robinson indicated that he understood them. Robinson responded that he did not want to sign a waiver of rights form, but that he would answer questions. Robinson also declined a request to notify his grandmother. Robinson did not indicate that he was unable to understand his rights. Robinson testified at the suppression hearing, however, that he agreed to answer questions from Agent Hicks, but that he "didn't know what that stuff means . . . [because] [he had] never been through it before." (J.A. at 470.)

In denying the motion to suppress, the district court noted Robinson "has an I.Q. score which is admittedly low," but "the defendant is street wise and . . . fully conversant with his rights that were articulated to him." (J.A. at 482.) The district court recognized Robinson failed to sign the waiver of rights form, but concluded, "although the waiver wasn't signed by the defendant, I'm satisfied that he[,]having been advised of these almost identical rights on two previous occasions known by this Court[,]that he was advised on that occasion and he properly waived his rights." (J.A. at 482.)

We do not believe that the district court erred by denying Robinson's motion to suppress. Robinson's below average I.Q. does not

make him per se incapable of intelligently waiving his rights. *See Moore v. Dugger*, 856 F.2d 129, 134-35 (11th Cir. 1988) (upholding waiver of rights by defendant with I.Q. of 62 and intellectual capacity of an eleven year old). In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited. In *United States v. Rosario-Diaz*, 202 F.3d 54 (1st Cir. 2000), the First Circuit upheld the denial of a suppression motion involving a woman with an IQ in the 70s and no prior experience with the criminal justice system because the officers testified that the woman understood the questions and rights. *Id.* at 69. *See also United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) (finding waiver was knowing for juvenile with attentional and learning disabilities because juvenile indicated that he understood the rights as they were being read to him).

In this case, Robinson indicated that he understood his rights as they were recited. Robinson had, on two prior occasions, been read his *Miranda* rights and waived them. *See United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002) (noting relevance that suspect had previously been given *Miranda* rights). On one of those occasions, Robinson's grandmother was also present during the reading of the rights. For a waiver to be knowing, Robinson need only understand "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quotation omitted). Although Robinson admittedly has a low I.Q. and several mental disorders, nothing in the record indicates that Robinson could not understand the rights as Agent Hicks provided them. To the contrary, the record reveals, as the district court explained, that Robinson was "street smart" and understood his *Miranda* rights.

## VI.

Finally, Robinson argues that he was sentenced in violation of the Supreme Court's recent ruling in *Booker*. On cross-appeal, the Government argues that the district court erred by granting Robinson a downward departure under the United States Sentencing Guidelines for diminished capacity because this downward departure led the district court to impose Robinson's sentences for violations of § 924(c)

concurrently instead of consecutively as statutorily required. Because we find merit in the Government's contention, we remand the case for resentencing. On remand, the district court should comply with the remedial scheme adopted by the Court in *Booker* in sentencing Robinson. *See United States v. Hughes*, 2005 WL 628224, * 4 (4th Cir. March 16, 2005).

During the sentencing hearing, the district court stated that Robinson's Guidelines sentence was approximately 193 years. That sentence was calculated as follows: 84 months for the first § 924(c) conviction, 300 months consecutive for the seven additional § 924(c) convictions, and 135 months for the armed robbery counts. The district court then, over the Government's objection, granted Robinson a downward departure for diminished capacity. The district court sentenced Robinson to 384 months imprisonment, running only the first § 924(c) conviction and one additional § 924(c) conviction consecutively.

Thus, the district court's decision to depart led it to run Robinson's § 924(c) convictions concurrently. Section 924(c)(1)(D)(ii), however, provides, in relevant part, that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person." 18 U.S.C.A. § 924(c)(1)(D)(ii). Accordingly, the statute mandates that each sentence for convictions under § 924(c) must be imposed consecutively. *See also Cristobal*, 293 F.3d at 146 n.19. Section 924(c) also sets out statutory minimum sentences for violations. Section 924(c)(1)(A)(ii) provides for a mandatory term of imprisonment of not less than seven years if the firearm was brandished during the commission of a crime of violence. Moreover, "[i]n the case of a second or subsequent conviction under this subsection, the person shall — be sentenced to a term of imprisonment of not less than 25 years." 18 U.S.C.A. § 924(c)(1)(C)(i). Robinson's first conviction for brandishing a firearm during a crime of violence thus necessitated a statutory minimum sentence of seven years. Each of the seven additional convictions under § 924(c) required statutory minimum sentences of 25 years to run consecutively to each other. Thus, under the statutory scheme enacted by § 924(c), Robinson faced a statutory minimum sentence of 2184 months, or 182 years. Any sentence entered for the substantive

robbery convictions must also run consecutive to that sentence. 18 U.S.C.A. § 924(c)(1)(D)(ii).

*Booker* did nothing to alter the rule that judges cannot depart below a statutorily provided minimum sentence. Except upon motion of the Government on the basis of substantial assistance, a district court still may not depart below a statutory minimum. *See* 18 U.S.C.A. § 3553(e) (West 2000). In this case, the district court sentenced Robinson to 384 months, over one-hundred years below the mandatory statutory minimum. Even though, after *Booker*, sentences outside of the guidelines range should be upheld when that sentence is a "reasonable" exercise of discretion, *see Booker*, 125 S.Ct. at 765, a district court has *no* discretion to impose a sentence outside of the statutory range established by Congress for the offense of conviction.

Because the district court departed below the statutory minimum, we must remand the case for resentencing. As the preceding discussion makes clear, Robinson is facing at least 2184 months of imprisonment for his crimes. While this result may seem manifestly unjust given Robinson's age and well-documented intellectual limitations, it is the result mandated by Congress.[5]

### VII.

We affirm Robinson's conviction in full but reverse the district court's decision to sentence Robinson below the statutory minimum mandated by his multiple convictions for violating § 924(c) and remand the case for resentencing.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

---

[5]Robinson's mandatory-minimum sentence under § 924(c)(1)(C)(I) and (D)(ii) is considerably longer than the sentences received by his co-defendants and the one he apparently would have received had he pleaded guilty. At oral argument, the parties stated that the Government offered Robinson a plea agreement entailing a sentence of less than twenty years. According to statements made during oral argument, the defendant and the Government agreed to this plea deal, but Robinson refused to properly complete a Rule 11 colloquy with the district court. Accordingly, because Robinson chose to proceed to trial, rather than face less than twenty years in prison, he is subject to this extraordinarily lengthy sentence.