**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4519**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL HOLMES, a/k/a Dan, a/k/a Big Dan,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Beaufort.  Sol Blatt, Jr., Senior District Judge.  (9:04-cr-00429-SB-1)

Argued: May 11, 2010                    Decided:  June 22, 2010

Before TRAXLER, Chief Judge, and NIEMEYER and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Robert Sneed, ROB SNEED LAW FIRM, LLC, Greenville, South Carolina, for Appellant.  Eric John Klumb, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.  **ON BRIEF:** W. Walter Wilkins, United States Attorney, Columbia, South Carolina, Matthew J. Modica, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Daniel Holmes challenges his conviction and sentence for conspiracy to possess with intent to distribute, and to distribute, 50 grams or more of cocaine base (crack) and cocaine. See 21 U.S.C.A. §§ 841(a)(1), 841(b)(1), & 846 (West 1999 & Supp. 2010). We affirm.

I.

This case arises out of Holmes' involvement in a drug distribution conspiracy in St. Helena Island and nearby areas in Beaufort County, South Carolina, from 1992 to 2002. To prove the conspiracy, the government presented the testimony of numerous witnesses who were involved in the distribution activities occurring there and who dealt with Holmes, as well as the testimony of law enforcement officers in South Carolina, Florida, and Texas, regarding their encounters with Holmes.

The first category of evidence pertains to Holmes' drug dealing activities during the years 1992 to 1994. Aldolpheous Green, Jamie Green, Joveco Scott, Andre Livingston, and Jermaine Fields all testified that they purchased crack from Holmes during this time period. Livingston further testified that Holmes "was fronting [him] the drugs" for sale, J.A. 442, and Fields testified that he and Scott "moved drugs for [Holmes],"

2

J.A. 482.  On one occasion, Scott and Livingston traveled with Holmes to Savannah, Georgia, with the intent to purchase drugs.

In May 1993, Beaufort County police officers arrested Holmes on a fugitive warrant.  During a search of Holmes' vehicle, the officers found crack weighing approximately 2.73 grams.  In January 1994, law enforcement officers arranged a controlled purchase of crack at Holmes' residence.  In March 1994, a second controlled purchase was made.  A search warrant was then obtained for Holmes' residence where officers found 3.47 grams of crack cocaine, 2.12 grams of powder cocaine, and firearms.  Holmes confessed to the officers that he had been selling crack for some time and that his 16-year-old nephew had been selling crack for him.  However, Holmes would not identify his nephew by name, his suppliers, or his customers.[1]

The second category of evidence consists of testimony describing Holmes' drug dealing activities from 1997 to 2002. Arthur Chaplin testified that he began selling crack in 1996 and first purchased crack from Holmes in 1997.  In 1998, Chaplin began purchasing powder cocaine from Holmes.  He made two nine-

---

[1] On August 17, 1994, Holmes pled guilty in state court to separate charges of possession with intent to distribute powder cocaine on March 19, 1994, possession with intent to distribute crack on March 15, 1994, and distribution of crack on January 20, 1994.  He was sentenced to twelve years in prison, suspended to six years in prison and five years' probation.  He was paroled on October 16, 1996.

ounce purchases from Holmes for $6,500 each, and traveled with Holmes to Savannah, Georgia, to pick up the drugs for the second purchase. Chaplin later gave Holmes $13,000 for the purchase of a kilogram of cocaine powder, which was to be a part of a larger purchase of 20 kilograms of cocaine by Holmes from a source in Coco Beach, Florida. Approximately two weeks after Chaplin gave Holmes the money, Holmes told Chaplin that the expected shipment of cocaine had not arrived and he asked Chaplin to travel to Florida with him and a third man to get the drugs.

On August 2, 1999, while en route to Coco Beach, Florida, Holmes was stopped by Nassau County Sheriff's detectives working with a drug interdiction team just outside of Jacksonville, Florida. A firearm found in the vehicle was claimed by Holmes and he was arrested and charged with possession of a firearm by a convicted felon and possession of a firearm with altered serial numbers. Chaplin and the third man continued the trip to Coco Beach, where they were to contact Holmes' nephew about the expected shipment. Upon arrival, however, Chaplin was told that the shipment had still not arrived and the men returned to Beaufort. When Chaplin arrived in Beaufort, he contacted Ivy Nesbitt, whom Chaplin understood was Holmes' "partner[] [i]n the drug game," and told Nesbitt that Holmes had been arrested on the trip. J.A. 291.

4

Approximately two weeks later, Holmes returned to Beaufort. Holmes gave Chaplin ten one-pound bags of marijuana to make up in part for the $13,000 that Chaplin had paid for the unrealized cocaine shipment. Shortly thereafter, Chaplin was traveling with Holmes on Seaside Road in St. Helena Island when Beaufort County officers initiated a traffic stop. Chaplin, who was driving, accelerated and Holmes threw four ounces of crack, which he had just given to Chaplin in further repayment of the debt, out of the window of the vehicle. Chaplin was charged with failure to stop for a blue light. Holmes was released and walked back to retrieve the crack he had thrown from the vehicle. A few days later, Holmes returned the crack to Chaplin. In December 1999, Chaplin purchased eighteen ounces of cocaine from Holmes for $12,000.

Romel Middleton testified that in 1997 or 1998, Holmes approached him "and asked [him] if [he] would like to make some money." J.A. 341-42. Holmes proposed that Middleton "sell[] crack cocaine with the means of making $100 a half a gram," and Middleton agreed. J.A. 342. Middleton testified that he was "working for Mr. Holmes." J.A. 342. According to Middleton, "a guy . . . named Ivy" was sometimes present during his dealings with Holmes. J.A. 344. Middleton testified that Holmes sometimes "fronted" him drugs and that he usually "came through . . . with the money" but "[s]ometimes . . . came up short."

5

J.A. 342. Eventually, Holmes "got tired of it" and "stopped dealing with" Middleton. J.A. 344. Middleton then began dealing with Chaplin. Sheniqua Moultrie also testified that she would bring crack buyers to Holmes and she would get "[e]xtra pieces of crack" in payment for her efforts. J.A. 419. Finally, Roderick Chisholm and Travis Polite testified that they purchased crack from Holmes in 1999. Aldolpheous Green testified that he sold crack to Holmes in 1998 and 1999.

In addition to Chaplin's testimony regarding Nesbitt's involvement with Holmes, other witnesses also implicated Nesbitt as a coconspirator with Holmes. Several witnesses, for example, testified that they would see the men together and believed them to be working together. Joseph Ferguson testified that he ran into Nesbitt at a gas station in the late 1990s and Nesbitt told Ferguson that they had crack for sale at "low prices," specifically 7 grams for $200. J.A. 405. Over the next several weeks, Ferguson twice visited Holmes' residence on Seaside Road, where he purchased the drugs from Holmes at the price quoted by Nesbitt. Dereck Grant testified that in the summer of 1998, he went to see Nesbitt, his usual supplier, at the Seaside Road residence and told Nesbitt that he "needed some work." J.A. 462. In Grant's presence, Nesbitt told Holmes "that he [Holmes] could go ahead and handle that" and Holmes got the drugs for

6

Grant.  J.A. 462.  Grant testified that he also fronted crack to Holmes in early 2002.

On September 26, 2000, the Beaufort County Sheriff's office made a controlled purchase of crack at Holmes' residence at Seaside Road.  Several days later, the officers executed a search warrant at the residence.  The officers found Holmes in his bedroom with crack.  Additional crack, Ziploc bags, and razor blades were found in the bedroom of Holmes' roommate, Donald Mitchell, who was not present at the time of the search. Nesbitt, whose legal residence was in Savannah, Georgia, was at the residence and a truck registered to him with Georgia tags was in the yard.  Officers found digital scales with cocaine residue, Ziploc bags, razor blades, and over $2,000 in cash wrapped around three driver's licenses in the truck.  A total of 5.94 grams of crack was seized during the search of the residence.

On April 16, 2001, Beaufort County Sheriff's officers observed Holmes' vehicle blocking traffic in a roadway.  Holmes and Chaplin were in the vehicle.  When the officers attempted to initiate a traffic stop, Holmes failed to stop. While in pursuit, the officers observed Holmes throwing crack out of the vehicle's window.  The total weight of the crack later retrieved by law enforcement officers was 1.58 grams.  Nesbitt came to the

scene of the stop and made eye contact with Holmes but did not communicate verbally with him.

On June 14, 2001, a narcotics interdiction patrol near Houston, Texas, a known source city for cocaine, stopped a vehicle carrying Nesbitt, Holmes, and two others. When the occupants of the vehicle gave conflicting stories to the officers and behaved nervously, a drug dog was brought to the scene and alerted officers to possible drugs in a gym bag in the vehicle. None of the occupants would claim the gym bag. While no drugs were found, the bag contained $134,500 in U.S. currency that was "[p]ackaged like dope money." J.A. 644.

On July 11, 2003, while Holmes was incarcerated for state drug convictions, federal law enforcement agents served Holmes with a Texas warrant for money laundering arising from the June 14, 2001, traffic stop. Holmes told the agents that "he was a small-time dealer and he dealt basically in Beaufort County to support his family and that he knew that one day he would be getting arrested." J.A. 499.[2]

On April 14, 2004, Holmes was charged in a two-count indictment in South Carolina district court. Count One charged Holmes with conspiracy to possess with intent to distribute, and

_____

[2] According to the Texas officer, Nesbitt was subsequently convicted and sentenced in Texas for money laundering. It appears that the charges against Holmes were dismissed.

8

to distribute, 50 grams or more of cocaine base (crack) and cocaine. Count Two charged Holmes with conspiracy to knowingly use and carry firearms in relation to drug trafficking offenses. On June 28, 2006, the government filed an information pursuant to 21 U.S.C.A. § 851 (West 1999) notifying Holmes that he would be subject to enhanced penalties due to his prior felony drug convictions. On May 3, 2007, the jury returned a verdict convicting Holmes of the drug count but acquitting him of the firearm count. Because Holmes had at least two prior felony drug convictions, he was sentenced to life imprisonment pursuant to the mandatory minimum sentence requirement of 21 U.S.C.A. §§ 841(b)(1)(A). This appeal, challenging both his conviction and life sentence, followed.

## II.

### A.

Holmes first contends that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence that he was involved in a drug distribution conspiracy. He contends that the evidence merely established that he was a conspiracy of one, engaged in buying and selling drugs in the area solely for his own benefit.

We review the district court's denial of a motion for judgment of acquittal de novo. See United States v. Smith, 451

9

F.3d 209, 216 (4th Cir. 2006); United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005).  We view the evidence in the light most favorable to the government and must affirm if the verdict is supported by "substantial evidence."  United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).  "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  Id.

In order to prove the charged conspiracy, the government must establish beyond a reasonable doubt:  (1) the existence of an agreement between two or more persons to distribute and possess cocaine with intent to distribute; (2) the defendant's knowledge of the conspiracy; and (3) that the defendant was knowingly and voluntarily a part of the conspiracy.  See United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008).  "By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement."  Burgos, 94 F.3d at 857.  Consequently, the "conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced."  Id.  "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the

10

conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy." Id. at 858 (internal quotation marks and alterations omitted). "[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." Id. (internal quotation marks omitted). It is also not necessary to prove "a discrete, identifiable organizational structure." Id. (internal quotation marks omitted). Rather "contemporary drug conspiracies can contemplate only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." Id. (internal quotation marks and alterations omitted). "[T]he fact that a conspiracy is loosely-knit, haphazard, or ill-conceived does not render it any less a conspiracy–or any less unlawful." Id. "Under the applicable principles, trial evidence is sufficient to establish a single conspiracy where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results." Smith, 451 F.3d at 218.

Here, there was substantial evidence to establish that a conspiracy existed between Holmes and Nesbitt to distribute crack in the St. Helena Island area of Beaufort County over the same time period. Witnesses admittedly involved in the drug

11

trade in the area testified that they understood that Holmes and Nesbitt were working together in the distribution efforts there. Nesbitt resided in Savannah, Georgia, where Holmes would travel to obtain drugs for sale. And Nesbitt would travel to Beaufort County where the two men conducted their drug dealing activities jointly from the Seaside Road residence. At least two witnesses were directed by Nesbitt to the Seaside Road residence for the purchase of drugs, where they dealt with either or both of the men. Ferguson testified that when he went to the residence at Seaside Road to buy drugs at the price quoted by Nesbitt, he obtained drugs from Holmes at the same price. Grant testified that when he went to see Nesbitt at the residence for "work," Nesbitt asked Holmes to "handle" getting Grant the drugs. J.A. 462. Nesbitt and his truck, with drug paraphernalia, were present at the Seaside Road residence during the September 29, 2000, search. And, of course, Nesbitt and Holmes were together during the June 2001 trip to Texas with $134,500 "[p]ackaged like dope money" in a bag that smelled of drugs. J.A. 644.

There was also substantial evidence to establish a conspiracy between Holmes and other residents of the St. Helena Island area to distribute crack in the area during this time period. In the early 1990s, Holmes confessed to law enforcement officers that his nephew was dealing drugs for him. Livingston testified that Holmes was fronting him drugs for sale.

12

Middleton testified that he worked for Holmes in the late 1990s, and that Holmes fronted him drugs for sale as well. Moultrie testified that she brought buyers to Holmes for payment in crack. And several additional witnesses testified that Holmes was supplying drugs to them.

In sum, there is substantial evidence to support the jury's determination that Holmes was knowingly and voluntarily a part of a conspiracy with Nesbitt and others to distribute cocaine and crack in the St. Helena Island area of Beaufort County, South Carolina, during the charged time period, and that he and his coconspirators shared the same objectives, methods and geographic spread in their distribution activities. Accordingly, the district court properly denied Holmes' motion for judgment of acquittal.

### B.

Holmes next contends that the trial court erred in permitting witnesses Ferguson and Grant to testify regarding the inculpatory statements made by Nesbitt either to them or in their presence. Specifically, Holmes challenges the admission of Ferguson's testimony that Nesbitt said he and Holmes had crack for sale at 7 grams for $200, which led to Ferguson purchasing the drugs from Holmes at the quoted price, and Grant's testimony that Nesbitt asked Holmes to get Grant the drugs he needed to sell when Grant sought out work from Nesbitt.

13

A statement is not hearsay if it is offered against a party and was made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). When the government shows by a preponderance of the evidence that a conspiracy existed of which the defendant was a member, and that the coconspirator's statement was made during the course of and in furtherance of the conspiracy, the statement is admissible. See United States v. Squillacote, 221 F.3d 542, 563 (4th Cir. 2000); United States v. Neal, 78 F.3d 901, 904-05 (4th Cir. 1996).

We generally review a district court's decision to admit a statement under Rule 801(d)(2)(E) for an abuse of discretion. See Neal, 78 F.3d at 905. Because Holmes did not make this objection at trial, however, we review for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). We will reverse only if (1) the district court committed an error, (2) the error is plain, and (3) the error affects substantial rights of the defendant. See id. at 732. Even if these prerequisites are met, however, "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial

14

proceedings." Id. (internal quotation marks and alteration omitted).

Here, the district court did not plainly err in allowing Nesbitt's statements into evidence. As discussed above, substantial evidence established Nesbitt to be a coconspirator of Holmes. Because Nesbitt's statements were made in the course and in furtherance of the conspiracy, they were clearly admissible under Rule 801(d)(2)(E).

C.

Holmes next contends that various comments the prosecutor made during closing arguments deprived him of a fair trial. Because there was no contemporaneous objection made to the statements, we review for plain error. See Olano, 507 U.S. at 731-32.

"[G]reat latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views." United States v. Johnson, 587 F.3d 625, 632 (4th Cir. 2009) (internal quotation marks, citations and alteration omitted). This is particularly true during closing argument – the "time for energy and spontaneity, not merely a time for recitation of uncontroverted facts." Id. (internal quotation marks omitted). "To be sure, there are some lines

15

that prosecutors may not cross. But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner." Id. at 633 (citation omitted); see also Bates v. Lee, 308 F.3d 411, 422 (4th Cir. 2002).

We apply "a two-pronged test for determining whether a prosecutor's misconduct in closing argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Wilson, 135 F.3d 291, 297 (4th Cir. 1998) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). A defendant must demonstrate (1) "that the prosecutor's remarks were improper" and (2) "that they prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial." Id. (internal quotation marks and alterations omitted). In evaluating whether the prosecutor's remarks prejudiced the defendant, we consider several factors, including:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; [and] (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters . . . .

United States v. Scheetz, 293 F.3d 175, 186 (4th Cir. 2002); United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995).

In the course of his closing argument, the prosecutor made several comments that Holmes contends were unsupported or misleading. First, Holmes objects to the prosecutor's arguments: (1) that Holmes admitted to the conspiracy when he confessed to law enforcement officers in 1994 that his nephew was selling drugs for him and when he confessed to DEA agents in 2002 to being a drug dealer; (2) that Holmes was involved in the conspiracy with his nephew, Mitchell, Middleton, and Grant; (3) that Mitchell admitted to being in a conspiracy with Holmes when he testified that Holmes fronted him drugs; and (4) that the $134,500 found in the car in Texas with Nesbitt and Holmes was drug money. However, we find these arguments to have been sufficiently supported by the testimony to be considered fair comments upon the evidence. The evidence was sufficient to establish that Holmes was involved in a conspiracy to distribute drugs in Beaufort County with Nesbitt and a number of other persons, including Holmes' nephew, Mitchell, Middleton, and Grant. The prosecutor remained within acceptable bounds in arguing that the statements Holmes made to law enforcement officers at the beginning and end of the conspiracy period could fairly be construed, in conjunction with the other evidence, as admissions on his part to having worked with others to supply

17

drugs to the area. And it was well within the permissible limits for the prosecutor to argue that the $134,500, packaged as drug money in a bag that smelled of drugs, had been near drugs at some point in the past and was intended to be used to purchase drugs in the future.

Second, Holmes claims that the prosecutor made three misstatements regarding the evidence presented at trial. Holmes asserts that the prosecutor erroneously represented to the jury that no specific promises had been made to Livingston or Chisolm in return for their testimony against Holmes. Holmes contends that the prosecutor erroneously represented that Chisolm and Scott had testified in a previous trial regarding their dealings with Holmes. And, Holmes objects to the prosecutor's statement that when Chaplin told Nesbitt of Holmes' arrest in Florida, Nesbitt told Chaplin not to worry because they would take care of it and get Holmes out of jail.

As to the prosecutor's statements regarding the lack of promises made to the witnesses, we find no error. Chisolm testified that the government had promised that his cooperation would be reported to the court and Livingston implied that he expected some benefit if he cooperated. However, neither statement or expectation is inconsistent with the prosecutor's correct representation that no specific promises had been made to either man.

18

With regard to the remaining remarks, the prosecutor does appear to have incorrectly expanded upon the testimony actually elicited at trial. Although both Scott and Chisolm testified that they had provided testimony in prior trials, Scott was not asked whether his prior testimony included information about Holmes and Chisolm was not asked about the specifics of his prior testimony about Holmes. However, even if the prosecutor's remarks were improper, the comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Wilson, 135 F.3d at 297 (internal quotation marks omitted). The remarks were brief and isolated, there is no indication that the prosecutor offered the remarks with an intention to mislead the jury or that they otherwise diverted the jury's attention from the evidence, and the proof of guilt in the case was significant. In addition, the jury was instructed that statements made by counsel were not to be considered evidence in the case. See Bennett v. Angelone, 92 F.3d 1336, 1346-47 (4th Cir. 1996). Accordingly, we find no reversible error in the prosecutor's statements, nor can we conclude that their cumulative effect warrants reversal. See United States v. Martinez, 277 F.3d 517, 534 (4th Cir. 2002).

19

III.

A.

Holmes next argues that the district court erred in sentencing him to life imprisonment under 21 U.S.C.A. § 841(b)(1)(A), because he did not have the requisite two prior felony drug convictions.

Prior to trial, the government filed an information under 21 U.S.C.A. § 851, notifying Holmes that he was subject to an enhanced sentence under § 841(b)(1)(A), based upon prior felony drug convictions. At sentencing, the government introduced five such convictions into evidence. The first three convictions were obtained on August 17, 1994, and consisted of (1) a conviction for distribution of crack on January 20, 1994, based upon a controlled purchase made at Holmes' Peaches Hill Road residence in St. Helena; (2) a conviction for distribution of crack on March 15, 1994, based upon a controlled purchase made at the Peaches Hill Road residence; and (3) a conviction for possession of cocaine with intent to distribute on March 19, 1994, when Beaufort County officers executed a search warrant at Holmes' Peaches Hill Road residence and seized cocaine and crack. Holmes was sentenced to 12 years' imprisonment for the three convictions, suspended upon serving 6 years' imprisonment and 5 years' probation. He was paroled on October 16, 1996, and granted early termination of his probation on January 11, 1999.

The remaining two felony drug convictions were obtained on March 11, 2002, and consisted of (1) a conviction for possession of crack cocaine on September 29, 2000, arising out of a search warrant executed at Holmes' residence at 527 Seaside Road, for which he was sentenced to two years' imprisonment, and (2) a conviction for possession with intent to distribute crack cocaine on April 16, 2001, arising out of the traffic stop for which he was sentenced to six years' imprisonment.

Holmes contends that the district court erred in counting the 1994 felony convictions as separate offenses for purposes of § 841(b)(1)(A), and in relying upon any of the five convictions as predicate offenses because they occurred during the conspiracy period and were intrinsic to it. We disagree.

"[F]or purposes of 21 U.S.C. § 841(b) . . . , the term 'prior convictions' refers to 'separate criminal episodes, not separate convictions arising out of a single transaction.'" United States v. Ford, 88 F.3d 1350, 1365 (4th Cir. 1996) (quoting United States v. Blackwood, 913 F.2d 139, 145-46 (4th Cir. 1990)). When evaluating whether convictions are from separate and distinct criminal episodes, we consider, among other things, whether the time between the crimes underlying the convictions allowed the defendant sufficient time "to make a conscious and knowing decision to engage in another drug sale." United States v. Letterlough, 63 F.3d 332, 337 (4th Cir. 1995)

21

(holding that sales of crack occurring nearly two hours apart arose out of "separate and distinct criminal episodes").

Here, the district court did not err in counting the three 1994 convictions as separate offenses. Holmes' first two convictions for distribution of crack arose from incidents occurring nearly two months apart. The third conviction arose from the execution of a search warrant four days after the second controlled purchase was made. Clearly, the convictions arose out of separate and distinct criminal episodes, even though they may all have occurred "pursuant to a master plan to sell crack cocaine as a business venture." Id.

The fact that the prior felony drug offenses occurred during the period of the conspiracy for which he was convicted also does not entitle Holmes to relief. "When a defendant is convicted of a drug conspiracy under 21 U.S.C. § 846, prior felony drug convictions that fall within the conspiracy period may be used to enhance the defendant's sentence if the conspiracy continued after his earlier convictions were final." Smith, 451 F.3d at 224-25. "[B]ecause the 'purpose of the mandatory minimum enhancement is to target recidivism, it is more appropriate to focus on the degree of criminal activity that occurs after the defendant's conviction for drug-related activity is final rather than when the conspiracy began.'" United States v. Howard, 115 F.3d 1151, 1158 (4th Cir. 1997)

22

(quoting United States v. Hansley, 54 F.3d 709, 717 (11th Cir. 1995)).

Here, the government presented substantial evidence that Holmes continued to engage in the conspiracy well after his 1994 convictions became final, most notably, evidence of all of the drug distribution activities he engaged in after he was paroled in 1996 including, but not limited to, the conduct that served as the basis for the two 2002 convictions. Holmes' continued participation in the conspiracy after his prior drug convictions became final "is precisely the type of recidivism to which section 841 is addressed." Howard, 115 F.3d at 1158.

## B.

Holmes also contends that his counsel was ineffective in failing to object to the use of his prior felony convictions to impose the enhanced sentence under §§ 841(b)(1)(A) & 851. However, claims of ineffective assistance of counsel must be brought in a collateral proceeding under 28 U.S.C.A. § 2255 (West Supp. 2010) unless it conclusively appears from the face of the record that his counsel was ineffective. See United States v. Richardson, 195 F.3d 192, 198 (4th Cir. 1999). In light of our resolution of the issue above, Holmes has clearly failed to make that showing here.

23

C.

Holmes' final contention is that the district court plainly erred in failing to apply the sentencing guidelines and sentencing factors under 18 U.S.C.A. § 3553(a), in accordance with our decision in United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006), thus requiring a remand for resentencing.

Based upon the total offense level and criminal history, as calculated in his presentence report, Holmes' guideline range was 360 months to life imprisonment. However, because he had two prior felony drug convictions, Holmes' statutory mandatory minimum sentence was life imprisonment under § 841(b)(1)(A), which became his guideline sentence. At the sentencing proceeding, the district court recognized that the guidelines range was 360 months to life and that the guidelines and § 3553(a) factors would have given the court some discretion in sentencing. However, the statutory, mandatory minimum sentence provision based upon the prior felony drug offenses removed any such discretion, rendering it unnecessary to specifically address Holmes' objections to the presentence report or the § 3553 factors. Instead, the district court adopted the presentence report without change and correctly determined that the mandatory minimum sentence of life imprisonment applied.

Although the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), made the guidelines advisory, it

24

did not alter the mandatory nature of statutorily required minimum sentences. See Green, 436 F.3d at 455-56; United States v. Robinson, 404 F.3d 850, 862 (4th Cir. 2005). "Except upon motion of the Government on the basis of substantial assistance, a district court still may not depart below a statutory minimum." Robinson, 404 F.3d at 862. Accordingly, we hold that the district court did not plainly err in imposing Holmes' sentence of life imprisonment, and Holmes is not entitled to resentencing.

IV.

For the foregoing reasons, we affirm Holmes' convictions and sentence.

AFFIRMED

25